A97A2517. IN THE INTEREST OF J. B. A. et al., children.

(495 SE2d 636)

RUFFIN, Judge.

In this appeal, the mother of J. B. A. and G. B. A. challenges the sufficiency of the evidence supporting the juvenile court's order terminating her parental rights. For reasons which follow, we affirm.

"The question on appeal is whether, after reviewing the evidence in a light most favorable to the lower court's judgments, 'any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.' [Cit.] This

Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met. [Cit.]" *In the Interest of R. N.*, 224 Ga. App. 202 (480 SE2d 243) (1997).

OCGA § 15-11-81 provides the grounds that a court must consider in determining whether to terminate parental rights. The court is first required to determine whether there is present clear and convincing evidence of parental misconduct or inability. OCGA § 15-11-81 (a). Parental misconduct or inability is found where (1) the child is deprived, (2) the lack of proper parental care or control by the parent in question is the cause of the child's deprivation, (3) the cause of deprivation is likely to continue or will not likely be remedied, and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81 (b) (4) (A). If such evidence exists, the court must then determine whether termination of parental rights is in the best interests of the child. OCGA § 15-11-81 (a).

1. There is clear and convincing evidence in this case of parental misconduct or inability. That evidence shows that the children, who are twins, were born on October 12, 1995. The Department of Family & Children Services ("DFCS") became involved with the twins in November 1995. DFCS learned that the twins were living in a two- or three-bedroom trailer with as many as thirteen other people who were, as the trial court put it, "engaged in various sexual relationships [sic] with each other though not married." The DFCS caseworker who investigated the report testified that when she first visited the trailer at approximately 11:00 a.m., everybody was still in bed. When the caseworker entered the trailer, she noticed that there was no door knob or latch of any kind on the front door and that some of the windows of the trailer were broken out of the trailer. Inside, she observed children and teenagers lying on the couch and on the floor. There was an unvented kerosene heater in the living room and dirty dishes, crawling roaches, clothes, clutter and other trash everywhere. The caseworker testified that even though you could smell fumes from the kerosene heater, two individuals lit cigarettes. She also noticed a bullet hole in the living room wall. A 15-year-old boy, who stated that he was having a sexual relationship with the twins' mother, explained that he fired a gun in the trailer because another individual "was threatening to commit suicide and he was trying to get his attention." The bullet went through the living room wall and lodged in the wall of the bedroom where the twins were sleeping. The 15-year-old has since married the twins' mother. The twins, who were approximately six weeks old at the time of the DFCS visit, were dirty and lethargic. One of the twins was previously admitted to the hospital when he stopped breathing.

At the conclusion of the visit, the twins' mother was arrested for sexual molestation, and the caseworker instructed the other trailer residents to find alternative housing. The mother's grandmother offered to take care of the twins. The grandmother immediately went to the jail, however, posted bail for the mother, and two days later the caseworker learned "that everybody was back in the trailer just like it was when we had gone over there and told them to vacate it." According to the twins' great aunt and uncle, the unhealthy conditions at the trailer existed before the twins were born and had not changed upon their last visit when the twins were three weeks old. The twins were adjudicated deprived, and DFCS arranged for the great aunt and uncle to take temporary physical custody.

When the great aunt and uncle received the twins, they were in very poor condition. Both twins appeared malnourished. One twin had a "real bad" diaper rash which left scars on the infant's buttocks. According to the uncle, "the diapers they had on had so much wet [sic] in them that they weighed like around five pounds each." The diaper rash medication prescribed for the twins remained in its packaging and had never been touched. Some of their feeding bottles had bug droppings on them. Both infants had irregular sleeping patterns due to the mother's practice of staying up late or all night and sleeping late in the morning.

Although a court-ordered reunification plan was established for the mother, she failed to satisfy several goals in the plan. According to her caseworker, the mother was instructed to obtain mental health counseling. After three appointments, however, she stopped attending, and her file "was closed because of her lack of participation and her lack of contacting the counselor." Although the mother was required to obtain stable housing, her caseworker stated that she had at least eight different residences during the previous year, that she often moved back into the trailer and that she moved so often the caseworker was having difficulty keeping up with her. While the mother visited the twins 23 times during the previous year, the caseworker stated that there was an "extreme . . . lack of bonding" and "very little interaction." According to the caseworker, the mother "normally sits on the couch and watches the boys play in [sic] the floor." And, while the mother obtained a required parenting skills class certificate based on her attendance, she failed to participate in the class and did not appear to grasp the information. The mother made only two child support payments of $20 each and, at the time of the hearing, was $1,780 in arrears of the required payments. Finally, although the mother was required to obtain steady employment, the caseworker was never "able to confirm that she ha[d] been employed anywhere."

(a) There is clear and convincing evidence that the children are

deprived. OCGA § 15-11-81 (b) (4) (A) (i). A child is deprived if he is without the care necessary "for his physical, mental, or emotional health or morals." OCGA § 15-11-2 (8) (A). It is undisputed that the children were adjudicated deprived in a November 26, 1995 deprivation order, and there is no indication that the order was appealed. See *In the Interest of M. R.*, 213 Ga. App. 460, 464 (1) (a) (444 SE2d 866) (1994). Furthermore, the evidence showed that since birth, and during the time the mother had custody of the children, they lived in a dilapidated, overcrowded, unsanitary, unsafe and morally depraved environment. They were not administered necessary medication and were left festering in soiled diapers. They were wanting, but denied any *meaningful*, supportive, parental attention from their natural mother, a condition that continued even after she lost custody and until the termination hearing. See OCGA § 15-11-81 (b) (4) (C) (i). Contrary to the reunification plan, the twins were denied any significant financial support from their natural mother, and there is no indication that the mother made any attempt to provide them with a safe, stable home from the time of their birth until the hearing. See OCGA § 15-11-81 (b) (4) (C) (iii).

(b) There is clear and convincing evidence that the lack of proper parental care by the mother is the cause of the twins' deprivation. OCGA § 15-11-81 (b) (4) (A) (ii). The mother was responsible for their living environment and lack of care prior to the temporary change in physical custody, and the mother's same indifference to the twins' needs resulted in her lack of parental care after the change of custody.

(c) There is clear and convincing evidence that the cause of deprivation is likely to continue or will not likely be remedied. OCGA § 15-11-81 (b) (4) (A) (iii). The deplorable conditions in the trailer existed before the twins' birth, during their first six weeks of life, and after DFCS intervention. Even after the temporary change in custody, the mother failed to take necessary steps to provide for minimal financial support, stable housing, steady employment or to obtain necessary mental health counseling. See *R. N.*, supra. And, although the mother has since married, it is to the same child who discharged the firearm in the trailer. There is no evidence that these problems will be remedied.

(d) We also find clear and convincing evidence that the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the twins. OCGA § 15-11-81 (b) (4) (A) (iv). There can be no doubt that if the twins were subjected to the continued medical, emotional, housing and financial neglect of their natural mother, they would suffer serious harm. See *In the Interest of P. N. L.*, 228 Ga. App. 187, 189 (1) (d) (491 SE2d 639) (1997).

2. The evidence similarly shows that termination of parental

rights is in the best interests of the children. OCGA § 15-11-81 (a). "The same evidence showing parental misconduct or inability may, and here does, establish this requirement. [Cit.]" *P. N. L.*, supra at 190 (2). Furthermore, additional testimony showed that during their stay with the aunt and uncle, the twins' health has improved dramatically and that the twins treat the aunt and uncle as parents. The aunt testified that she has bonded with the twins, and the caseworker agreed stating that "to move them from their home . . . would break a great bond that they have with them. . . ." See id.

3. Finally, we disagree with the mother's assertion that the trial court erred in terminating her parental rights because DFCS failed to clearly define her reunification goals as required by OCGA § 15-11-41 (d) (3). The record shows that the mother attended the Citizen Review Panel meeting at which the reunification plan was established. The plan contained six goals, and the caseworker testified that she "made it very clear to [the mother] what [was] expected of her throughout the case." Similarly, a panel member stated that the panel explained each goal to the mother and that she appeared to understand the goals. The mother did not take advantage of her statutory right to request a hearing before the juvenile court to review the plan, and it was subsequently adopted by the court in a supplemental order. The juvenile court's order clearly stated that the mother was required "to comply with each and every portion of the plan, including any and all requirements for evaluation and treatment and all requirements for financial child support." Of the six goals in the plan, the mother achieved only one — regular visitation. Although the mother *initially* complied with some of the goals in a subsequent plan, as stated above, the evidence of record shows that after three appointments she stopped attending required mental health counseling, she never obtained stable housing, she made only two $20 child support payments and was $1,780 in arrears, and the caseworker was never able to confirm that she was employed.

In short, it is clear that the mother's failure to comply with the reunification plans was not the result of any ambiguities in the stated goals, but a consequence of her own actions. See *In the Interest of C. G. A.*, 204 Ga. App. 174, 176 (3) (418 SE2d 779) (1992). The goals were sufficiently clear to comport with the requirements of due process. See *In the Interest of S. L. W.*, 221 Ga. App. 509, 511 (2) (471 SE2d 579) (1996).

*Judgment affirmed. Birdsong, P. J., and Eldridge, J., concur.*

DECIDED JANUARY 14, 1998.

*Jerry W. Moncus*, for appellant.

*Thurbert E. Baker, Attorney General, Jeffrey L. Milsteen, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Stephanie M. Baldauff, Assistant Attorneys General, Michael R. McCarthy, Richard K. Murray, Deborah H. Peppers, for appellee.*