A98A0452. IN THE INTEREST OF J. S. et al., children.
(502 SE2d 788)

SMITH, Judge.

This is an appeal by a mother from an order of the juvenile court terminating her parental rights.[1] Appellant contends that, based on the evidence, the trial court could not have found all the facts required to support a termination of her parental rights. She also contends she did not receive adequate notice of the citizen review panel findings or the case plan goals. We disagree with appellant's contentions and affirm.

1. Before considering whether to enter an order terminating parental rights, the trial court must first determine whether there exists "clear and convincing evidence of parental misconduct or inability." OCGA § 15-11-81 (a). To reach this determination, the court must find that the child is deprived within the meaning of OCGA § 15-11-2 (8) due to a lack of proper parental care or control by the parent in question, that this state of affairs is likely to continue or is not likely to be remedied, and that such deprivation will or is likely to cause the child serious physical, mental, emotional, or moral harm. OCGA § 15-11-81 (b) (4) (A). If the court makes this preliminary determination based on clear and convincing evidence, termination of parental rights is authorized if the court likewise finds such action will best serve the child's interest and needs, "including the need for a secure and stable home." OCGA § 15-11-81 (a). Alternatively, the court may conclude that the child's interest and needs will be served best by disposition under OCGA § 15-11-34. OCGA § 15-11-81 (c).

On appeal of a termination of parental rights, we view the evidence in the light most favorable to the appellee. *In the Interest of*

---

[1] The order also terminated the father's parental rights, but he does not join in this appeal.

*A. M. V.*, 222 Ga. App. 528, 529 (474 SE2d 723) (1996). Viewed in this light, the evidence shows that child welfare authorities investigated appellant's family in Texas in early 1995. Responding to a report that the infant S. S. was severely undernourished, a caseworker with the Texas Department of Protective & Regulatory Services met with appellant and S. S. at the Department offices. The infant was dirty and obviously small for her age, and appellant was unable to tell the caseworker her feeding schedule. A physician who examined S. S. testified that she was "skin and bone." His diagnosis was failure to thrive, marasmus (absence of body fat), cachexia (absence of muscle), emaciation, and malnutrition. He testified that S. S.'s condition was "very serious, life threatening" if left untreated.

As part of the investigation, Texas caseworkers visited the paternal grandmother's house, where appellant and the father were living with J. S. and S. S. Another caseworker investigated the case of an elderly, mentally handicapped man who had been abused and neglected and was confined in a shed-like structure under the house. These caseworkers testified to conditions that can only be described as squalid. The yard was strewn with rusting junk, and "real big dogs" were on chains or loose in the yard. At least ten people, including a "child sexual abuse perpetrator," were living in the four-room structure. The rooms and furniture were extremely dirty, with "a strange odor" and animal waste. Animals, including a calf, were allowed to wander through the house at will. The nearby trailer in which appellant falsely claimed she and the father were living was in total disrepair and uninhabitable, with no utilities, rooms boarded off, sections of the floor missing, and a doorless refrigerator, sink, and toilet in the middle of the living room floor.

When the caseworkers attempted to discuss these conditions with the parents, they became very hostile and uncooperative, blaming S. S.'s condition on others, including her doctor and the Texas authorities. The father told the caseworkers that they would go to Georgia to avoid dealing with the Texas authorities, even though S. S. had been released from the hospital only a few hours earlier. The caseworkers left the scene to obtain an emergency custody order from a judge. When they returned, the parents had fled with the children. The grandmother told them, "We knew what was going on. We knew you were going to do that so they just took off and left."

The family was located in Georgia, and the Whitfield County Department of Family & Children Services obtained an order removing the children from the home. DFACS obtained temporary legal custody of the children based on a finding of deprivation. A case plan was developed pursuant to former OCGA § 15-11-41 (c) (1)-(6) and incorporated in the custody order in May 1995.

In August 1995, the children were returned to their parents for a

trial placement. Despite the court order placing legal custody in Whitfield County, the parents in October 1995 fled again with the children, returning to Texas. Appellant acknowledged that she knew they were not supposed to take the children to Texas. Texas authorities retrieved the children, they were returned to Georgia, and they have been in foster care since that time.

S. S.'s malnutrition has been remedied in foster care, but she has remaining problems with hyperactivity, communication skills, and attention span. Her older brother, J. S., is blind, autistic, and suffers from severe developmental delay. He "cannot be left unattended, period," because of his extremely destructive behavior that poses a risk of harm to himself and to others.

While the children were in foster care, appellant and the father returned to Georgia, then left the state again and returned to Texas, moving back and forth between Texas and Florida until the father was arrested on an outstanding warrant. While in Florida, appellant was sexually involved with two other men and became pregnant again.

After J. S. and S. S. were placed in foster care, a judicial citizen review panel adopted recommendations in accord with the DFACS case plan, requiring among other goals that the parents cooperate with DFACS, learn parenting skills, obtain permanent, suitable, and safe housing and steady employment, and visit their children regularly. The panel's recommendations were appealed and affirmed by the juvenile court. Regular reviews of the case plan goals were held to monitor appellant's progress.

Testimony was presented at the termination hearing that appellant had made little progress on the case plan. She was instructed to maintain a stable job and residence, but was unemployed for three months and then worked at six jobs in ten months; she was fired or "just quit." Although appellant informed DFACS that she would be living at her mother's house in Florida, she had lived in at least three other locations by the time of the hearing. She acknowledged that she never lived in one place for more than a few months and moved from job to job.

Appellant visited the children only once in the year of the termination hearing and four times in the previous year. She missed numerous scheduled visitation appointments, and she also failed to keep three appointments for therapeutic programs designed to help J. S. Appellant contended she could not travel from Florida while pregnant, but she did not call the children for months at a time and did not send any clothing or gifts for them. Other than one occasion on which she sent the children's foster parent $30 in cash, she sent three money orders totaling $64 in child support, but only after the petition to terminate parental rights was filed.

As to the first two factors required in the trial court's decision, the evidence clearly showed that the children were deprived due to parental inability. "[T]here was clear and convincing evidence of these two factors by virtue of the fact that the mother failed to comply with virtually every condition of the reunification plans. Finally, no appeal was taken from the order of the juvenile court . . . and thus the mother is bound by that determination." (Citations and punctuation omitted.) *In the Interest of L. S. F.*, 217 Ga. App. 478, 480 (458 SE2d 370) (1995).

Having found that the children are deprived and that such deprivation is caused by appellant, we next consider whether the deprivation of the children is likely to continue and have a detrimental effect on them. In addition to evidence of present parental misconduct or inability, evidence of past conduct may be considered in determining whether the deprivation is likely to continue and cause harm to the children. *In the Interest of T. B. R.*, 224 Ga. App. 470, 474 (480 SE2d 901) (1997); *In the Interest of A. M. V.*, supra, 222 Ga. App. at 531-532.

Appellant presented evidence that she has now married the father of her third child and is living with him. She contends this demonstrates stability and a change in her situation refuting previous evidence of parental unfitness. But marriage and relocation, standing alone, do not constitute conclusive evidence of newly acquired fitness. See, e.g., *In the Interest of W. J. G.*, 216 Ga. App. 168, 172 (4) (453 SE2d 768) (1995).

Appellant also contends that the evidence was insufficient to show present unfitness because much of the evidence at the hearing concerned events that took place some time before the termination hearing. We disagree. "In a termination case, evidence that is one or two years old is not outdated. There will necessarily be some passage of time between the date the children are taken from the parents' home and the date of the termination hearing. . . . The lapse of time in this case was not inordinate." *In the Interest of A. M. V.*, supra, 222 Ga. App. at 531. In addition, the juvenile court is not required to reunite the children with appellant "in order to obtain current evidence of deprivation or neglect. [Cit.]" *In the Interest of E. C.*, 225 Ga. App. 12, 16 (482 SE2d 522) (1997). This is particularly true when appellant has fled the jurisdiction of the court with the children on two previous occasions.

Moreover, sufficient evidence exists that detrimental deprivation is likely to continue. The record is replete with examples of appellant's failure to cooperate with both Texas and Georgia authorities in obtaining medical care and special services for the children. This pattern has continued; appellant obtained a certificate of completion from a child care course but testified that she was unable to remem-

ber anything she had learned. At the time of the hearing, she had made no effort to learn about J. S.'s profound special needs or the skills necessary to care for him. This is clear and convincing evidence from which the trial court could find that appellant's inability or unwillingness to address her children's needs was likely to continue and likely to cause serious harm to the children.

Appellant made no significant attempts to comply with the case plan until after a decision was made to terminate parental rights. The trial court was authorized to assign less weight to "assertions of sudden parental fitness" based on belated efforts to comply with a case plan after termination proceedings begin. *In the Interest of T. B. R.*, supra, 224 Ga. App. at 475. "While this may indicate an attempt to comply with the DFCS reunification plan, it falls very short of negating years of abandonment and harmful neglect. [Cit.]" Id. The trial court correctly observed that "[a] few months of partial stability does not establish for the court that the parents are capable of maintaining the progress."

Appellant also has continued to blame others for her problems, asserting at the hearing as she did to Texas authorities and the citizen review panel that the children were not neglected and should not have been removed from her custody. This lack of recognition of her own responsibility is properly considered by the trial court in determining whether deprivation is likely to continue. See, e.g., *In the Interest of E. C.*, supra, 225 Ga. App. at 16. Appellant blames the father for the violence in the family, but the incidents of violence did not end with that relationship. Her relationship with her subsequent sexual partner was also abusive, and she has personally been involved in other violent episodes including an altercation with her husband's former girl friend and a confrontation with the paternal grandmother at a supervised visit.

The record also contains considerable evidence of appellant's lack of credibility. Testimony was presented that she lied to caseworkers and to a citizen review panel regarding her most recent pregnancy, her criminal history, her involvement with men, her residence, and the whereabouts of the father. Appellant claimed to have sent an additional $700 in cash to the foster parent, but the foster parent denied this. Appellant also claimed a caseworker told her to move to Florida in order to regain custody of the children; the caseworker denied this. Finally, evidence was presented that appellant and the father fabricated a separation in order to "fool" the authorities and regain custody. The trial court was authorized to consider appellant's lies, deceptive conduct, or conflicting statements in weighing her testimony and determining the chances of her successful rehabilitation. *In the Interest of E. C.*, supra, 225 Ga. App. at 19, n. 5. See also *In the Interest of T. B. R.*, supra, 224 Ga. App. at 475.

Appellant has demonstrated continued inability or unwilling-ness to address the children's special needs, particularly those of the profoundly needy J. S. Over a two-year period, she not only failed to comply with most of the goals of the case plan but engaged in an active pattern of misrepresentation, concealment, and flight from the jurisdiction, actively frustrating these goals. Appellant clearly placed her own wishes and desires above the stable home, visits, and medi-cal and developmental care needed by the children. This evidence supports the trial court's determination that deprivation is both likely to continue and to cause serious harm to J. S. and S. S. See *In the Interest of L. S. F.*, supra.

Finally, after finding "parental misconduct or inability" under OCGA § 15-11-81 (a), the trial court then must determine whether terminating parental rights is in the best interest of the child. "Those same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent would be in the child's best interest." (Citations and punctuation omitted.) *In the Interest of E. C.*, supra, 225 Ga. App. at 18. Viewing the evidence, as presented above, in the light most favorable to the appellee, there is more than sufficient clear and convincing evidence that the termination of appellant's parental rights is in the children's best interests. The children are well cared for together in a foster home and have formed an emo-tional bond. Education and therapeutic services are being provided for J. S., and he has made improvement in all areas. In contrast, there is no evidence that the children, particularly J. S., will receive adequate care from appellant; there is evidence that appellant is unprepared to care for them.

"The question on appeal is whether, after reviewing the evidence in a light most favorable to the lower court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met." (Citations and punctuation omitted.) *In the Interest of R. N.*, 224 Ga. App. 202 (480 SE2d 243) (1997). There is more than sufficient clear and convincing evidence in this case for a rational factfinder to conclude that appellant's parental rights should be terminated and that such termination is in the best interests of J. S. and S. S.

2. We disagree with appellant's assertion that the trial court erred in terminating her parental rights because DFACS failed to define clearly her reunification goals as required by OCGA § 15-11-41 (d) (3). The record shows that the mother signed the DFACS case plan and attended the judicial citizen review panel meeting at which

the reunification plan was established. She signed a copy of the plan, acknowledging "that the above statements have been fully explained and any questions fully answered." She attended many subsequent panel meetings at which she signed the same statement. All versions of the plan required that appellant cooperate with DFACS, learn parenting skills, maintain "permanent, suitable and safe housing," maintain steady employment, and visit the children. The DFACS case plan, as part of the requirement that appellant maintain steady employment, required that she "pay the appropriate amount of child support." Appellant acknowledged at the termination hearing that she understood she was required to establish a stable residence, maintain a job, and visit her children.

As noted in Division 1, supra, appellant failed to comply with most of the requirements of the plan. "In short, it is clear that the mother's failure to comply with the reunification plans was not the result of any ambiguities in the stated goals, but a consequence of her own actions. The goals were sufficiently clear to comport with the requirements of due process." (Citations and punctuation omitted.) *In the Interest of J. B. A.*, 230 Ga. App. 181, 185 (495 SE2d 636) (1998).

*Judgment affirmed. Johnson, P. J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED JUNE 16, 1998.

*Jerry W. Moncus*, for appellant.

*Thurbert E. Baker, Attorney General, Jeffrey L. Milsteen, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Waycaster, Morris, Johnson & Dean, Cynthia N. Johnson, Michael R. McCarthy, James M. Barnes*, for appellee.

