521 S.E.2d 906 (1999)
239 Ga. App. 771
In the Interest of B.L.S. et al., children.
No. A99A0949.
Court of Appeals of Georgia.
September 1, 1999.
*907 T. Mark Thedieck, Thomasville, for appellant.
Thurbert E. Baker, Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Daniel M. Mitchell, Jr., Quitman, Melinda M. Katz, Thomasville, for appellee.
RUFFIN, Judge.
Following a hearing, the Thomas County Juvenile Court terminated the parental rights of the parents of B.L.S. and M.J.S.
*908 The children's mother appeals, arguing that there was insufficient evidence to support the termination of her parental rights.[1] We affirm.
In reviewing appellant's challenge to the sufficiency of the evidence, we determine "whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost." (Punctuation omitted.) In the Interest of A.C., 230 Ga.App. 395, 396(1), 496 S.E.2d 752 (1998). We do not weigh the evidence or determine the credibility of witnesses, but defer to the juvenile court's factfinding. In the Interest of L.H., 236 Ga.App. 132, 133(1), 511 S.E.2d 253 (1999).
Viewed in this light, the evidence shows as follows. In September 1995, the Thomas County Department of Family & Children Services ("DFACS") obtained emergency custody of four-year-old B.L.S. and two-year-old M.J.S. after appellant left them with a woman who was unable to care for them. Following a hearing, the juvenile court entered an order finding that the children were deprived and transferring custody of them to DFACS for a period not to exceed 18 months. Appellant did not appeal that ruling. The children were placed in foster care, and DFACS developed a case plan to reunite appellant with her children. The case plan set various goals for appellant, including keeping a stable home environment, visiting the children, learning to manage her money, and getting counseling; it also outlined specific steps designed to help her meet those goals.
The juvenile court extended its initial custody several times with appellant's consent. The children remained in the custody of DFACS for approximately three years. Appellant's progress was reviewed every six months by DFACS and a judicial citizen review panel. The case plan was revised numerous times, but the goals remained essentially unchanged.
On August 6, 1998, DFACS filed a petition to terminate the parental rights of the parents of B.L.S. and M.J.S. on the grounds that the father could not be found and appellant had made no significant progress toward accomplishing the goals set forth in her case plans. On September 25, 1998, the juvenile court held a hearing on the petition.
Dr. Ann Lucas, a licensed psychologist who examined appellant in April 1997 and again in June 1998, testified at the hearing that appellant functions cognitively at a fourth or fifth grade level and has a dependent personality disorder. According to Lucas, the personality disorder renders appellant unable to care for herself or others "in a consistent and nurturing way" and unable to provide adequately for the physical, mental, emotional, and moral needs of her children. Lucas testified that the disorder is long term and can be overcome only with years of "extremely intensive" therapy. Lucas noted that at her second evaluation, appellant was able to recite information about appropriate parenting skills, but Lucas believed that appellant was unable to apply this knowledge to her own children and "still was very overwhelmed by ordinary life kinds of skills and situations."
Dr. Lisa Rudolph Watson, a psychiatrist, testified that she had approximately 12 counseling sessions with B.L.S. from August 1996 to September 1998. Dr. Watson diagnosed B.L.S. as suffering from attention deficit hyperactivity disorder, for which she prescribed medication, as well as a reactive attachment disorder. According to Dr. Watson, these disorders have resulted in impaired social skills and will require that B.L.S. receive ongoing medication and special care. Dr. James Brown, a licensed clinical psychologist, testified that he has counseled B.L.S. on a weekly basis since January 1998 for "issues relating to her history of neglect as well as current adjustment problems in her foster home." Dr. Brown testified that B.L.S. suffers from post traumatic stress disorder, obsessive compulsive "picking of her skin," and *909 fear of closed places, and he attributed these problems to her "primary home of origin." According to Dr. Brown, B.L.S. needs a stable, permanent home as soon as possible, and delay in this regard could result in serious psychological harm.
Dr. Brown also testified that he has observed M.J.S. on several occasions and found her to be immature for her age. A psychological evaluation of M.J.S. conducted in October 1997 concluded that "intervention came at a crucial time in this child's life as she is functioning relatively well at this point in time."
Sandy Godwin, appellant's DFACS caseworker from January to August 1998, testified that she repeatedly met with appellant, explained the requirements of the case plans, and offered numerous services to help appellant obtain stable employment, get counseling, and develop parenting skills. According to Godwin, however, appellant failed to comply with the case plans and made no progress in her ability to parent her children. Appellant initially attended counseling, but admittedly dropped out after six sessions because, according to her, it was "unreasonable" of DFACS to require her to see a psychiatrist and she "didn't really see the need in going." Appellant went to some of the prescribed parenting classes, but dropped out because she felt she "[got] the meaning of it." DFACS then arranged for a parenting instructor to visit appellant at home, but appellant missed all nine scheduled appointments because she was not home. Godwin testified that since her children were removed from her custody, appellant has moved 12 times, living with various people, and has had 13 changes in employment. Finally, Godwin testified that appellant does visit her children every other week, but cannot control them and grows frustrated during the visits. Pam Glover, another DFACS caseworker who worked with appellant from March to September 1998, testified that appellant failed to keep her informed of changes in address and employment, so that Glover had trouble finding her, and failed to turn over bill receipts in compliance with the case plan. Glover also testified that at one point, appellant was living with a family that DFACS had worked with in the past and did not consider to be an appropriate placement for children. Appellant told Glover that she has no family in the area who could provide support. According to Glover, appellant made no progress during the time that Glover worked with her and lacks the ability to concentrate on her children and provide a stable home.
Appellant admitted at the hearing that she has neglected her children in the past by leaving them with different persons, but stated that she feels she has "learned [her] lesson." She testified that if she regained custody of her children, she would take care of them and provide them with a place to live. Appellant also testified that she understood that the case plans were designed to enable her to get her children back, but stated that she decided about seven months before the hearing not to cooperate with DFACS anymore because it would be futile.
The children's guardian ad litem also testified at the hearing, recommending termination of parental rights. On October 9, 1998, the juvenile court issued an order terminating appellant's parental rights based on its finding that the children were deprived due to (1) appellant's inability to parent, stemming from her personality disorder, and (2) appellant's misconduct, stemming from her failure to comply with the court-ordered plans to reunite her with her children. The juvenile court thus terminated the parental rights of appellant and the unknown father or fathers of B.L.S. and M.J.S.
A two-step analysis is employed in parental rights termination cases. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81(b)(4)(A)(i)-(iv); In the Interest of L.H., supra at 132-133(1), 511 S.E.2d 253. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, *910 and moral condition and needs, including the need for a secure, stable home. Id.; OCGA § 15-11-81(a).
In this case, there was ample clear and convincing evidence of the four factors required to establish parental misconduct or inability. First, "[t]he unappealed deprivation orders of the juvenile court are sufficient to establish that [the children were] deprived within the meaning of OCGA § 15-11-81(b)(4)(A)(i)." In the Interest of A.C., 234 Ga.App. 717, 719, 507 S.E.2d 549 (1998).
Second, in determining whether the children were without proper parental care and control, the juvenile court was authorized to consider any "medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." OCGA § 15-11-81(b)(4)(B)(i). Dr. Lucas testified that appellant suffers from a dependent personality disorder, which renders her unable to care for her children and can be treated only by years of intensive therapy. "A mental disability that renders a parent incapable of caring for the child is a valid legal basis for termination." (Punctuation omitted.) In the Interest of L.H., supra at 135(1), 511 S.E.2d 253. This is particularly true given appellant's unwillingness to undergo treatment for her disorder.
The juvenile court also could consider whether appellant without justifiable cause failed significantly for a period of one year or more to comply with the court-approved case plans developed by DFACS to reunite her with her children. OCGA § 15-11-81(b)(4)(C)(iii); In the Interest of R.P., 216 Ga.App. 799, 800-801(2), 456 S.E.2d 107 (1995). The undisputed evidence clearly showed that appellant failed to comply over a three-year period with virtually every goal set forth in the case plansincluding not attending mental health counseling, not participating in parenting classes, and not maintaining a stable home or regular employmentdespite numerous efforts by DFACS to assist her in meeting the goals. Appellant showed no justifiable cause for failing to comply with the case plans. In fact, she testified that she did not attend counseling sessions and parenting classes because she thought she did not need them and that she decided to stop cooperating with DFACS approximately seven months before the termination hearing because she thought it was futile. Appellant's failure over a three-year period to meet the goals of her case plans provides an additional basis for the juvenile court's finding that lack of proper parental care or control by appellant caused her children's deprivation. See In the Interest of J.S., 232 Ga.App. 876, 879(1), 502 S.E.2d 788 (1998); In the Interest of R.P., supra.
Third, in determining whether the children's deprivation is likely to continue, the juvenile court could consider appellant's past conduct. In the Interest of A.C., 234 Ga.App. at 719, 507 S.E.2d 549. The evidence showed that appellant had a serious psychological condition that rendered her incapable of caring for her children and that she had made little or no progress toward obtaining adequate parenting skills. Yet, at the time of the hearing, appellant was not attending counseling sessions or parenting classes and professed no interest in doing so. Although appellant apparently had a job, a place to live, and a car at the time of the hearing, "a few months of partial stability [do] not establish for the court that [appellant was] capable of maintaining ... progress." (Punctuation omitted.) In the Interest of J.S., supra at 880, 502 S.E.2d 788. Appellant's wilful failure to attend counseling sessions and parenting classes, coupled with the evidence of past deprivation, authorized the juvenile court's finding that the deprivation of B.L.S. and M.J.S. would likely continue should the two be returned to appellant's custody.
Fourth, clear and convincing evidence showed that continued deprivation likely would harm the children. According to the mental health professionals who testified at the hearing, B.L.S. requires special attention for her multiple psychiatric and psychological problems, which could worsen unless she is quickly placed in a stable home. Although there was little testimony about the condition *911 of M.J.S., Dr. Watson testified that all children need a stable home environment.
As to the second prong of the termination analysis, the evidence also was sufficient to show that termination of appellant's parental rights was in the best interest of B.L.S. and M.J.S. We have held that "the court may consider the child's need for a stable home environment and the detrimental effects of prolonged foster care. Children need permanence of home and emotional stability or they are likely to suffer serious emotional problems." (Citation omitted.) In the Interest of J.O.L., 235 Ga.App. 856, 858, 510 S.E.2d 613 (1998). Here, the evidence showed that both children, and B.L.S. in particular, need a stable home and could be harmed by prolonged foster care. In addition, the same factors which show appellant's inability to care for her children support a finding that termination of parental rights would be in the children's best interest. Id. Accordingly, we affirm the order of the juvenile court terminating the parental rights of appellant.
Judgment affirmed.
McMURRAY, P.J., and ANDREWS, P.J., concur.
NOTES
[1] The identity of the children's father or fathers is not known. Appellant provided the names of two potential fathers of B.L.S. and M.J.S., but paternity tests were negative. No one has ever acted as a father toward the children or claimed to be the father, and a search of the Georgia Putative Father Registry yielded no information about paternity.