A06A1866. IN THE INTEREST OF D. L. T., a child.
(641 SE2d 236)

ELLINGTON, Judge.

The mother of two-year-old D. L. T. appeals from the termination of her parental rights. She contends the trial court erred in finding that her daughter's deprivation was likely to continue or to harm the child, and that the court erred in determining that termination of her parental rights was in the child's best interest. Finding no error, we affirm.

A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. [OCGA § 15-11-94 (b) (4) (A) (i)-(iv).] If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. [OCGA § 15-11-94 (a).]

In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any

rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated. In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.

(Footnotes omitted.) *In the Interest of T. L.*, 279 Ga. App. 7, 10 (630 SE2d 154) (2006).

Viewed in the light most favorable to the court's ruling, the record shows the following relevant facts. D. L. T. was born on August 1, 2004. At the time of D. L. T.'s birth, the mother was seventeen years old and had been in foster care for approximately two years. The Georgia Department of Family and Children Services ("DFCS") had removed the mother from her home due to abuse and neglect by her parents, as well as allegations of sexual abuse by a family friend. At the age of 15, the mother demonstrated symptoms of mental illness, and she admitted to using illegal drugs and being sexually active. DFCS provided the mother with birth control, but she refused to use it. During her first two years in foster care, the mother was "kicked out" of several foster care facilities because she was unable to get along with others living in the facilities. Although the mother completed the tenth grade, she refused to attend school regularly after that and refused to get a job or to participate in vocational training.

When D. L. T. was born, the mother and baby were placed in a group home for young mothers. Within a few months, however, the mother had a serious conflict with others in the group home and was forced to leave. The mother spent two weeks in the hospital for depression before DFCS placed her in a new foster home. Because there was no space for the baby in the new home, however, DFCS placed D. L. T. in a separate foster home. In the fall of 2004, DFCS established a reunification plan that required the mother to demonstrate her ability and willingness to care for the baby, maintain her current foster care placement, complete parenting classes, complete her education, seek part-time and summer employment, and pay child support.

From January 2005 until her 18th birthday in March 2005, the mother refused to get a job or go to school. After the mother turned 18, DFCS no longer had custody of her, but it retained custody of D. L. T. DFCS amended the reunification plan to require the mother to maintain stable housing and employment for six months, participate in vocational rehabilitation, complete parenting classes, visit the child, participate in counseling, and pay $10 per week in child support. In March 2005, the mother moved in with her sister for approximately ten months. Then, in December 2005, the mother

moved into her 22-year-old boyfriend's apartment; her name was not on the apartment lease. Neither the mother nor her boyfriend, who is disabled, had a driver's license or owned a car.

In the meantime, in September 2005, DFCS filed a petition to terminate the parental rights of the mother and D. L. T.'s putative father.[1] At the time of the February 2006 termination hearing, the mother had been out of the foster care system for almost a year. During that time, the mother held seven or eight different jobs for periods ranging from two days to two months, and she had been unemployed for about a month prior to the hearing. At the time of the hearing, the mother was $220 in arrears in child support payments, and her only sources of support were her boyfriend's $600 monthly disability check and his food stamps. Although DFCS had offered the mother counseling, she only saw a counselor one time. She also had not participated in vocational training or obtained her GED.

During the termination hearing, Dr. John Dickens, a clinical psychologist, testified about three evaluations of the mother that he had conducted, two in 2002 and 2003 while she was in DFCS custody, and the third in June 2005. During each of those visits, Dr. Dickens observed signs that the mother was suffering from mental illness for which she needed therapy. In June 2005, Dr. Dickens diagnosed the mother as having borderline personality disorder, post traumatic stress disorder, distimic disorder (low-grade chronic sadness), and ADHD. He recommended that the mother receive long-term psychotherapy, and he expressed concern about whether the mother would be able to properly care for D. L. T. given that she was unable to care for herself and had so many problems in her life. Dr. Dickens opined that, based upon the mother's history of mental illness and her past behavior, her "prognosis for being a stable parent in the near future is very small, very limited."

Following the hearing, the juvenile court found that the mother had failed to fulfill many of the goals of her reunification plan, including the housing, employment, counseling, and child support requirements. In its order, the court stated that

> [t]here is no doubt that this mother loves this child. However, her own circumstances have placed her in the position of not being able to provide the basic necessities for the child since the child's birth one and one-half years ago. The mother's mental health issues will not be resolved in the

---

[1] A DFCS caseworker testified that the mother initially identified the father as "Demerius Williams," but the mother later admitted that she had made up the name. The juvenile court subsequently terminated the parental rights of Williams and "any unknown, unnamed biological father" of D. L. T.

immediate future, if ever. . . . To require [the child] to remain in care indefinitely when the mother may never be able to assume full custody would be cruel and detrimental to the child.

Based upon its findings, the court concluded that the causes of the child's deprivation are likely to continue and are likely to cause serious harm to the child. The court also found that the mother was an unfit parent and that there was a high probability that the child would be seriously harmed if she was returned to the mother's care. After finding that termination of the mother's parental rights to D. L. T. was in the child's best interest, the court entered an order terminating her rights.

1. On appeal, the mother argues that there is insufficient clear and convincing evidence to show that D. L. T.'s deprivation is likely to continue.[2] See OCGA § 15-11-94 (b) (4) (A) (iii). She contends that she "has completed a great deal of her case plan" prior to the termination hearing, such as completing parenting classes and visiting the child twice a month. She also claims that she has paid her child support by sending a $220 check to DFCS two days before the termination hearing (DFCS had not received the check at the time of the hearing).

In addition, the mother contends that she participated in counseling as required under the plan, although she testified that she only went to see a counselor one time in December 2005, three months after DFCS filed the termination petition. The mother claims that her mental health was "fine" on the date of the termination hearing because she was taking prescription medication to address her mental health problems. At the hearing, however, she testified that one of the prescriptions costs at least $225 per month and that Medicaid was going to stop paying for her medication in one month. The mother offered no explanation as to how she planned to pay for her medications once her benefits expired.

Even so, on appeal, she argues that the juvenile court should have accepted her testimony that her mental health was fine at the time of the hearing instead of Dr. Dickens' testimony regarding her "past mental health condition." The juvenile court, however, is responsible for weighing the evidence presented and for resolving any conflicts in the evidence. *In the Interest of T. L.*, 279 Ga. App. at 10. After hearing the testimony, the court found that the mother had a history of mental health problems, that she required long-term

---

[2] The mother does not challenge the court's findings as to the first two factors required for termination of her parental rights: that her child is deprived and that her failure to complete her case plan reunification goals is the cause of such deprivation. See OCGA § 15-11-94 (b) (4) (A) (i)-(ii).

psychotherapy to address those problems, that she had failed to get the required therapy or counseling since she left foster care, and that her mental health issues "will not be resolved in the immediate future, if ever." These findings are supported by clear and convincing evidence in the record.

In addition to evidence of the mother's history of unresolved mental health problems, the record also showed that the mother has failed to make any significant progress on her reunification plan since D. L. T.'s birth in August 2004. The mother failed to maintain stable housing and employment, failed to pay child support in a timely manner, and failed to obtain her GED or participate in vocational training, all of which were required under the plan. Further, the record clearly shows that, at the time of the termination hearing, the mother lacked the resources to complete the reunification plan in the foreseeable future. She had no independent source of income and was completely dependent upon her boyfriend, with whom she had lived for just two months. Given her unemployment at the time of the hearing, her lack of job skills, her history of being unable to retain a job for more than two months, and the impending loss of her prescription drug benefit, the mother's situation was unlikely to become more stable in the foreseeable future. In addition, the record shows that D. L. T. has been in foster care her entire life, yet the mother has consistently been either unable or unwilling to take the steps necessary to provide a home for, support, and care for the child on her own.

"In addition to evidence of present parental misconduct or inability, evidence of past conduct may be considered in determining whether the deprivation is likely to continue and cause harm to the [child]." (Citations omitted.) *In the Interest of J. S.*, 232 Ga. App. 876, 879 (1) (502 SE2d 788) (1998). Although the mother argues that she has recently made some efforts to comply with the reunification plan, the trial court "was authorized to assign less weight to assertions of sudden parental fitness based on belated efforts to comply with a case plan after termination proceedings begin." (Citation and punctuation omitted.) Id. at 880 (1) (noting that a few months of partial stability does not establish that a parent is capable of maintaining the progress). "The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." (Citation and punctuation omitted.) *In the Interest of T. B.*, 267 Ga. App. 484, 487 (1) (600 SE2d 432) (2004). Ultimately, "the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court." (Citation and punctuation omitted.) *In the Interest of G. B.*, 263 Ga. App. 577, 583 (1) (588 SE2d 779) (2003).

Based upon the record, there was sufficient clear and convincing evidence to support a finding that the mother's inability or unwillingness to resolve the problems which have caused D. L. T.'s deprivation is likely to continue and will not be remedied. OCGA § 15-11-94 (b) (4) (A) (iii), (b) (4) (B) (i) (a lack of parental care or control may be shown by evidence of a "medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child"); *In the Interest of J. S.*, 232 Ga. App. at 881 (1); *In the Interest of G. L. H.*, 209 Ga. App. 146, 150 (2) (433 SE2d 357) (1993) (a court may consider the parent's failure to participate in court-ordered mental health counseling when determining whether the child's deprivation is likely to continue or will not be remedied); cf. *In the Interest of C. G.*, 235 Ga. App. 23, 25 (508 SE2d 246) (1998) (the record was insufficient to terminate a parent's rights where the State failed to present any medical or psychological testimony or other evidence identifying the nature of the parent's mental instability and its expected duration).

2. The mother also contends there was insufficient clear and convincing evidence to support a finding that D. L. T. is likely to suffer serious harm by remaining in the foster care system until the mother is able to complete the reunification plan. OCGA § 15-11-94 (b) (4) (A) (iv). The same evidence that the child's deprivation is likely to continue, however, may also support a finding that a child will likely suffer serious harm from that continued deprivation. *In the Interest of C. J.*, 279 Ga. App. 213, 217 (1) (630 SE2d 836) (2006). As we concluded in Division 1, supra, there was clear and convincing evidence that the cause of D. L. T.'s deprivation, the mother's ongoing mental health problems and her failure to complete the requirements of the reunification plan, was likely to continue unabated for the foreseeable future.

Further, the record shows that D. L. T. has been in the same foster home since she was about five months old, that she is bonded to her foster parents and is doing very well in their home, and that the foster parents want to adopt her. Evidence that the mother failed to take the steps necessary for reunification, that the foster parents have provided the child with a stable and secure home, and that they want to adopt the child will support a finding that the child would be harmed by further deprivation. *In the Interest of C. J.*, 279 Ga. App. at 217-218 (1); see also *In the Interest of A. K.*, 272 Ga. App. 429, 438 (1) (d) (612 SE2d 581) (2005) (the court is "authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm" to the child) (footnote omitted); *In the Interest of B. I. F.*, 264 Ga. App. 777, 781 (1) (592 SE2d 441) (2003) ("it is well established

that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems") (footnote omitted); cf. *In the Interest of D. F.*, 251 Ga. App. 859, 862 (555 SE2d 225) (2001) (finding insufficient evidence that keeping the children in foster care while their mother worked on completing the case plan would harm the children, when the children's foster family did not wish to adopt the children and there were no identifiable prospects for placing the children in a permanent adoptive home).

Having reviewed the record in this case, we find that there is sufficient clear and convincing evidence to support the juvenile court's conclusion that the child is likely to suffer serious harm if the mother's parental rights are not terminated and the status quo is allowed to continue indefinitely.

3. The mother contends the juvenile court erred in reaching the issue of whether termination of her parental rights was in the child's best interest. The mother relies on her argument that there was insufficient evidence that her parental inability or misconduct was going to continue or was likely to cause serious harm to the child. In Divisions 1 and 2, supra, however, we rejected the mother's insufficient evidence argument. Accordingly, this enumeration presents no basis for reversing the juvenile court's judgment.

*Judgment affirmed. Johnson, P. J., and Miller, J., concur.*

DECIDED JANUARY 8, 2007.

*Rodney Q. Quarles*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Cynthia N. Johnson*, for appellee.