605 S.E.2d 407 (2004)
269 Ga. App. 783
In the Interest of D.J.F., a child.
No. A04A1028.
Court of Appeals of Georgia.
September 30, 2004.
*409 Phillips & Kitchings, Richard Phillips, Ludowici, for appellant.
Thurbert E. Baker, Attorney General, William C. Joy, Shalen S. Nelson, Senior Assistant Attorneys General, Jerry W. Caldwell, Jesup, James A. Chamberlin, Jr., Brunswick, for appellee.
SMITH, Chief Judge.
After a hearing, the parental rights of the father of D.J.F. were terminated by written order of the Juvenile Court of Wayne County. The juvenile court dismissed the appeal on the ground that the father had failed to meet his burden of having the hearing transcript prepared and filed under OCGA § 5-6-42. The father appeals, contending that his notice of appeal was improperly dismissed and that his parental rights should not have been terminated. Because we conclude that the appeal was not unreasonably delayed, we agree with the father that the juvenile court erred in dismissing his notice of appeal. We therefore vacate the juvenile court's order dismissing the notice of appeal and reinstate the appeal. We also conclude, however, that the record supports the juvenile court's decision to terminate the father's parental rights. We therefore affirm in part and vacate in part.
1. We first address the father's argument that the juvenile court erred in dismissing his notice of appeal. The trial court entered its written order on April 17, 2003. The father filed a notice of appeal on May 19, 2003, and an amended notice on July 3, 2003. On September 3, 2003, the Department of Family and Children Services (DFACS) moved to dismiss the notice of appeal on the ground that the father had not filed or paid the cost of the transcript and had not sought an extension of time for filing the transcript. Following a hearing on September 25, 2003, the juvenile court orally granted the motion to dismiss, finding that the father caused the delay in filing the transcript and that the delay was unreasonable and inexcusable.
On October 2, 2003, the juvenile court entered a written order finding that the father bore "the burden of having the transcript prepared and filed within thirty (30) days unless extended" under OCGA § 5-6-42. The court further found that the father had not ordered or paid for a transcript, that no transcript had been filed, that the delay was caused by the father, and that the delay in filing the transcript had "caused delay in providing permanency for the child." The court concluded that the delay was unreasonable and inexcusable and dismissed the notice of appeal. The transcript was filed with the Wayne County clerk's office on the same date as the trial court issued its written order on the motion to dismiss, and it was sent to us along with the record.
During the hearing on the motion to dismiss, the father's counsel acknowledged that he had not ordered a transcript from the court reporter. He stated that DFACS had ordered it and that he had "never seen one produced any faster with two orders than there would be with one, and we asked that we get a copy of it whenever it was finished." He had "never heard of having to order a transcript twice." The court reporter testified that she prepared transcripts "as fast for one side as the other."
The burden of filing the transcript was on the father. OCGA § 5-6-42 states that "the appellant shall cause the transcript to be prepared and filed as [required] by Code Section 5-6-41" and that "[t]he party having the responsibility of filing the transcript shall cause it to be filed within 30 days after filing of the notice of appeal ... unless the time is extended as provided in Code Section 5-6-39." The transcript was not prepared within 30 days of the filing of the notice of appeal, and no extension was sought.
Failure to request an extension alone, however, is not sufficient ground for dismissal. In the Interest of C.F., 255 Ga. *410 App. 93, 94(1), 564 S.E.2d 524 (2002). Nor does tardiness in the failure to have the transcript filed necessarily warrant dismissal of a notice of appeal. Under OCGA § 5-6-48(c), "a trial court may order the dismissal of an appeal only after notice and an opportunity for a hearing, and then only if the court finds that there has been an unreasonable delay in the filing of the transcript and it is shown that the delay was inexcusable and was caused by such party." (Citations and punctuation omitted.) Holy Fellowship Church of God in Christ v. First Community Bank etc., 242 Ga.App. 400, 403, 530 S.E.2d 24 (2000). Whether "delay in filing a transcript is unreasonable is a separate matter from the issue of whether such a delay is inexcusable, and refers principally to the length and effect of the delay rather than the cause of the delay." (Citations, punctuation and emphasis omitted.) Cook v. McNamee, 223 Ga.App. 460, 461, 477 S.E.2d 884 (1996). An unreasonable delay is one that might "affect an appeal by: (a) directly prejudicing the position of a party by allowing an intermediate change of conditions or otherwise resulting in inequity; or (b) causing the appeal to be stale." (Citations and punctuation omitted.) Id. at 462, 477 S.E.2d 884.
It was the father's duty to obtain a transcript and have it filed within 30 days of the notice of appeal. He failed to do so, and he failed to request an extension of time to file the transcript. Nevertheless, fortunately for the father, a transcript was ordered, albeit apparently by counsel for DFACS. Even assuming that the father caused the delay and that the delay was inexcusable, any delay did not directly prejudice the rights or positions of the parties. No showing has been made of the occurrence of "any intermediate change of conditions" resulting [from the delay or that the delay] "caus[ed] this appeal to [become] stale." Id. at 462, 477 S.E.2d 884 Under these circumstances, we conclude that the juvenile court erred in finding that the delay was unreasonable and dismissing the father's notice of appeal. We therefore vacate the order of dismissal and reinstate the father's appeal.
2. We next reach the father's contention that the court erred in terminating his parental rights. On appeal of an order terminating parental rights, we must "view the evidence in the light most favorable to the appellee ... and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights have been lost." (Citation omitted.) In the Interest of S.L.B., 265 Ga.App. 684, 595 S.E.2d 370 (2004). We "do not weigh the evidence or determine the credibility of the witnesses but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review." (Citation omitted.) Id.
Construed in support of the juvenile court's judgment, the record shows that the Wayne County Department of Family and Children Services (the department) became involved with the mother of D.J.F. and D.J.F.'s three siblings in June 2001. D.J.F. was seven years old at the time. Her older sister was eight years old, and her younger brother and sister, who were twins, were three years old. After the department took the children into custody and filed a deprivation petition, the juvenile court found the children to be deprived. This ruling was not appealed. At the time the children were taken into custody, the whereabouts of their putative fathers were unknown. The department ultimately filed a petition to terminate the parental rights of the mother and all putative fathers of the children in March 2002. Following a hearing, the juvenile court terminated the mother's parental rights as well as the parental rights of the putative fathers of three of the children in July 2002. The parental rights of D.J.F.'s father were not terminated at that time, however, because the father had filed a petition for legitimation, which remained pending. The court "continue[d] the decision of terminating his parental rights pending the completion of the legitimization process." The legitimation petition was granted in November 2002.
The juvenile court conducted a hearing on the petition to terminate the father's parental rights on March 27, 2003. D.J.F. was nine years old at the time. Donna Parsons, the caseworker assigned to the case from June 2001 through the end of the year, testified that her first contact with the father occurred *411 on June 22, when she received a telephone call from him. He "wanted to know what he had to do to see the child and what he could do to get the child." He provided her with a Florida address, explaining that he lived with his sister and that "he had a bad reputation in Wayne County" and had been banned from the county until August 2001. Parsons explained to the father that he needed to legitimate D.J.F. before the department would begin to attempt reunification. Four months later, she met with the father and told him that the department's case plans required payment of child support and that "he had to go through Child Support Enforcement to do that. He didn't think it was fair and basically that's it." She testified that during the time she worked on the case, the department never received any child support from the father and that D.J.F. never received any cards, letters, or presents from the father. Although Parsons informed the father in June 2001 that he must legitimate D.J.F., he did not file such a petition until June 2002.
Nancy Jones, the caseworker assigned to the case from early January through early August, 2002, testified that she never spoke with the father. In June 2002, after the father spoke with Jones's supervisor about a publication notice he had seen, the father left two messages on Jones's answering machine. He called her first and provided a telephone number and immediately called back, stating that he had given her the wrong area code and ostensibly providing a correct number. Jones tried to return his call, but received no response. Like Parsons, Jones testified that the department had not received child support from the father and that the father had not sent D.J.F. any cards or letters and did not remember her on holidays.
Susan Platt, the school counselor at the elementary school attended by D.J.F., testified that D.J.F. was "doing well" in third grade and appeared to be well adjusted in her foster care placement, where she had lived for approximately one year. D.J.F.'s three siblings lived in the same foster home, and she had a particularly close relationship with her older sister. Platt testified that D.J.F. "feels very close to her siblings. I feel like that's where she obtains a lot of her identity. She is extremely close to ... her older sister. They've gone through a lot of the turmoil together and helped each other survive." Platt believed that it was important to D.J.F. "to be treated the same as her other brothers [sic] and sisters." She testified that D.J.F.'s first memory of her father was of his "beating up his brother" when D.J.F. was three or four years old, and she speculated that D.J.F. was fearful as a result of this observation.
Platt "believe[d] that breaking the closeness" of the siblings, particularly the relationship between D.J.F. and her older sister, "would be very detrimental to" D.J.F. She stated that D.J.F. "has a strong attachment to want to stay with her siblings and the foster parents who are the prospective adoptive parents. I don't see her seeking out after a relationship with her father, but I don't see her saying no to it either." Platt testified that D.J.F. had told her that she wanted to live with her siblings and foster parents but also that she would like to visit with the father. She stated that D.J.F. wanted "to be adopted by the people that she wants to be calling her daddy and mom."
D.J.F.'s current caseworker, Petula Gomillion, testified that the father had never paid child support or remembered D.J.F. at holidays. She stated that her first contact with the father occurred the week of the hearing. Gomillion testified that she had participated in a case review earlier in the month and that the new plan implemented on D.J.F.'s behalf, like all previous plans, "was geared toward non-reunification." The father was added onto the case plan in March and was directed to provide the department with an address, telephone number, and information concerning income. A copy of the plan was mailed to the father. Gomillion testified that the father had five days to dispute the plan and failed to do so.
Like Platt, Gomillion testified that D.J.F. had expressed some "desire to have contact with" the father. When asked whether Gomillion had "done anything to make that possible," she testified that the father had left a message on her voice mail and that she had unsuccessfully tried to return his call "several *412 times." Although she thought that allowing D.J.F. "to explore her desire to have contact with her biological father" would be "good for her," Gomillion also believed that prolonging the termination proceedings would "cause problems for [D.J.F.]. She has expressed ... some uneasiness with everything keep[ing] going on and on and on. She's a bright child. She knows that everything is finalized with her siblings and she basically wants everything finalized with her as well." At the time of the hearing, D.J.F.'s siblings had not in fact been adopted, and Gomillion believed that adoption proceedings were "on hold" until the conclusion of the hearing in D.J.F.'s termination case.
D.J.F.'s foster mother testified that she and her husband hope to adopt all four siblings at the same time. She testified that she is related "by blood" and by marriage to other members of D.J.F.'s family. During the 11 months that D.J.F. lived with her foster parents, she never received a card or letter from the father, and the father never remembered her on holidays or important occasions. The foster mother testified that D.J.F. wished to be adopted by her foster parents but also that she desired to "meet sometimes with her father to know that he is okay and we understand and respect her wishes." She believed that D.J.F. "would be best placed with us" but that she and her husband would be willing to allow D.J.F. to have some visitation with the father as long as this was not disruptive to D.J.F.
The father testified that he learned that D.J.F. was his daughter when she was three years old and had no contact with her before that time. He did not know her year of birth, stating that she was born either in 1993 or 1995, or where she was born. She lived with the father during parts of 1997 and 1998, and he testified that he visited with D.J.F. when he lived in Florida. He stated that he once gave D.J.F. a gold bracelet for her birthday but that he never gave her other gifts because the department prohibited this. He admitted that he had never financially supported the child but acknowledged that he was required to do so. The father admitted that he had been convicted of driving with a suspended license and DUI. He also "had a drug conviction," for which he had been on probation for five years.
Under OCGA § 15-11-94, termination of parental rights requires a two-step process.
First, the juvenile court must determine whether there is present clear and convincing evidence of parental misconduct or inability, as defined in OCGA § 15-11-94(b). Parental misconduct is found when the child is deprived, the cause of the deprivation is lack of proper parental care or control, the cause of the deprivation is likely to continue or will not likely be remedied, and the continued deprivation will cause or is likely to cause serious harm to the child. Second, if the juvenile court finds clear and convincing evidence of parental misconduct or inability, it must consider whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.
(Citations and footnotes omitted.) In the Interest of K.W., 262 Ga.App. 744, 745, 586 S.E.2d 423 (2003).
The juvenile court's previous finding of deprivation was not appealed, and the father is bound by that ruling. In the Interest of J.J., 259 Ga.App. 159, 161-162, 575 S.E.2d 921 (2003). We therefore next consider whether the evidence supports the court's finding that lack of proper parental care and control caused the deprivation. In making this determination, a juvenile court must consider among other things whether the child has suffered "[p]hysical, mental, or emotional neglect." OCGA § 15-11-94(b)(4)(B)(v). If the child is not in the custody of the parent subject to the termination proceedings, the court also must consider
whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) To develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii)[T]o provide for the care and support of the child as required by law or judicial decree; and (iii) To comply with a court ordered plan designed *413 to reunite the child with the parent or parents.
OCGA § 15-11-94(b)(4)(C)(i)-(iii).
The record shows that even though the father may have allowed D.J.F. to live with him and visited with her before she was taken into the department's custody, he failed to develop any parental bond with her or provide for any of her needs after she was placed in the department's care. Although he was told shortly after D.J.F. was taken into custody that he needed to legitimate her, he waited at least a year to initiate legitimation proceedings. The child was not legitimated until approximately seven months after the termination petition was filed. In addition, as pointed out by the department, the father's "whereabouts throughout the juvenile court proceedings... were frequently unknown and his contact with the department's personnel was sporadic at best."
We agree with the department that although the father "may have expressed a desire to some of the caseworkers that he wanted to visit with the child, he failed to maintain sufficient contact with the department's personnel which would have permitted them to schedule visits ... even assuming that they were required to do so under the circumstances of [this] case." The father testified that he had received between $12,000 and $13,000 in workers' compensation between May 2001 and December 2002 and had been employed making $350 a week for several weeks in early 2003. He failed to financially support D.J.F., however. Regardless of the fact that a court order was never issued requiring that the father pay child support, as the father of D.J.F., he had "a statutory duty to support [the child], with or without a court order. OCGA § 19-7-2." In the Interest of R.W., 248 Ga.App. 522, 526(2), 546 S.E.2d 882 (2001). Under these facts, we conclude that sufficient clear and convincing evidence was presented that the father neglected D.J.F. and failed to support and maintain a parental bond with her and therefore that the father's lack of parental care caused her deprivation.
We next consider whether the deprivation is likely to continue. OCGA § 15-11-94(b)(4)(A)(iii). "Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue." (Citation omitted.) In the Interest of K.W., supra, 262 Ga.App. at 747(1)(c), 586 S.E.2d 423. The father's failure to support and maintain any type of bond with his child continued up until the time of the termination hearing. The trial court was entitled to infer from the evidence that this pattern would continue. The evidence also supports the conclusion that termination was necessary to prevent serious emotional or mental harm to D.J.F. Although some testimony was presented indicating that the child wished to have some contact with her father, other testimony showed that she desired a permanent home with her siblings and that removing her from her foster home would be detrimental to her.
Finally, "[t]he same factors that show parental misconduct or inability can support a juvenile court's finding that termination of parental rights is in the [child's] best interest[ ]" (Citation and punctuation omitted.) In the Interest of K.W., supra, 262 Ga.App. at 748(2), 586 S.E.2d 423. The guardian ad litem recommended to the juvenile court that the father "be given additional time to develop a relationship with" D.J.F., and other witnesses indicated that allowing visitation with the father might be acceptable. But it was the juvenile court, and not these individuals, who bore the responsibility of determining whether termination was necessary and in D.J.F.'s best interest. Evidence was presented that D.J.F. was thriving in school and in her foster home, that her foster parents desired to adopt her and her siblings, that she had no meaningful relationship or bond with her biological father, and that despite his professed intentions, the father's inattention to the needs of his child was likely to continue. The evidence supported the juvenile court's conclusion that termination was in D.J.F.'s best interest.
We note the father's implicit argument in his appellate brief that he was not properly served with notice of the termination hearing. The father raised issues concerning notice *414 in a June 2002 letter to the juvenile court judge, arguing that the termination proceeding was premature due to lack of proper service and because his legitimation petition was pending. In its July 2002 order terminating the mother's rights and those of two other putative fathers, however, the juvenile court explicitly continued the proceedings against the father. During the subsequent hearing, the father raised no objections to service and cannot now complain on appeal. See In the Interest of D.R.W., 229 Ga.App. 571, 574-575(2), 494 S.E.2d 379 (1997). The father also seems to argue vaguely that reversal is required because the department never sought reunification. We note that evidence was presented that the father received the final case plan prepared by the department. Like all prior plans, it contemplated nonreunification. As discussed above, the father did not dispute that plan. Contrary to the father's contentions, sufficient clear and convincing evidence was presented on which the juvenile court could base its decision to terminate the father's parental rights. We therefore affirm the judgment of termination.
Judgment affirmed in part and vacated in part.
JOHNSON, P.J., and PHIPPS, J., concur.