A06A2354. IN THE INTEREST OF S. R. M., a child.

(641 SE2d 666)

PHIPPS, Judge.

The mother of S. R. M. appeals the termination of her parental rights to her child, challenging the sufficiency of the evidence and contending that proceeding with the termination hearing in her absence violated her due process and equal protection rights. For reasons that follow, we affirm.

Termination of parental rights under OCGA § 15-11-94 requires the juvenile court to undertake a two-step process. First, the court must determine whether there is clear and convincing evidence of parental misconduct or inability as provided in OCGA § 15-11-94 (b). Under that Code section, parental misconduct or inability may be found when (1) a child is deprived; (2) the cause of the deprivation is lack of proper parental care or control; (3) such deprivation is likely to continue or not likely to be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If there is clear and convincing evidence of parental misconduct or inability, OCGA § 15-11-94 (a) then requires the court to consider whether terminating the parent's rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home. On appeal, we construe the evidence in the light most favorable to the findings of the juvenile court, and our standard of review is

whether a rational trier of fact could have found that the parent's rights should be terminated.[1]

The mother's aunt testified that when S. R. M. was born in July 2004, the child's mother was incarcerated for "drugs and prostitution" and allowed S. R. M. to go home with her, rather than be placed in foster care. When S. R. M.'s mother was released from prison in October 2004, she visited her child once, holding her while the child was asleep. According to the aunt, the mother showed no "kind of motherly bond" and left shortly thereafter. Subsequently, the aunt arranged for the mother to stay with her for about a week to bond with S. R. M., but the mother never took advantage of that arrangement. After several weeks passed with no word from the mother, a "missing person" report was filed.

In April 2005, the aunt sought temporary letters of guardianship of S. R. M. S. R. M.'s mother was located in a Florida prison and consented to the guardianship. Among several duties, the letters charged the aunt with a "duty to see that the minor is adequately fed, clothed, sheltered, educated and cared for, and that the minor receives all necessary medical attention."

In February 2006, the aunt petitioned to terminate the parental rights of the mother and the putative father. At the time of the termination hearing, S. R. M. was living with the aunt, with whom she had lived since birth. The mother had provided no financial support, clothing, food, or shelter for S. R. M. and had never contacted the aunt since her one brief visit when the child was three months old.

The mother was not present at the termination hearing. She was incarcerated in Florida, serving two concurrent thirteen-month sentences for cocaine possession. According to the aunt, during the four years preceding the hearing, S. R. M.'s mother had "been in and out of jail" and had been free during those years for a total of only about four months. The aunt recounted, "Every time she gets out and they put her somewhere, the next day she's out on the streets back to what she was doing." Based upon the mother's history, the aunt predicted that after the mother's release from prison, "she would go back to the streets."

Regarding a father for S. R. M., evidence at the petition hearing showed that a blood test administered at the time of S. R. M.'s birth indicated that the mother's husband was not S. R. M.'s biological father. He had never provided any support for S. R. M. and eventually surrendered his parental rights to the child. A certificate from the

---

[1] *In the Interest of H. D. T.*, 273 Ga. App. 863, 863-864 (616 SE2d 196) (2005).

Putative Father Registry was introduced into evidence; it showed that no one had acknowledged paternity of S. R. M.

The aunt testified that she had been S. R. M.'s only stable, loving adult influence and proclaimed, "I'd like to make it stay stable." She testified that she was physically, emotionally, mentally, and financially able to support S. R. M. and planned to adopt her. Accordingly, she had filed the petition.

After the aunt rested her case, the mother's attorney sought a continuance until the mother's release "to allow [the mother] to be here to see what kind of opportunity she might have upon her release from this most recent incarceration." Further, the attorney stated, a continuance would allow the mother "to be heard in this matter" by telephone. The court denied the request, noting that the mother had the opportunity to present evidence by affidavit or deposition. The court then heard from the guardian ad litem, who recommended that the parental rights of the mother and putative father be terminated, and the court thereafter terminated the parental rights of S. R. M.'s mother and putative father.

1. The mother contends that the evidence was insufficient to terminate her parental rights. She points out that her aunt had been charged with a duty to adequately feed, clothe, shelter, educate, and care for S. R. M. and therefore S. R. M. was not deprived.

A child is deprived if the child "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[2] In determining whether the child is without proper parental care or control, the court shall consider, among other things, (i) physical, mental, or emotional neglect of the child; and (ii) a conviction of the parent of a felony and imprisonment therefor, which has a demonstrable negative effect on the quality of the parent-child relationship.[3]

> While a parent's incarceration does not always compel the termination of parental rights, it can support a termination where there are sufficient aggravating circumstances present. These aggravating circumstances may include a history of incarcerations for repeated criminal offenses and a determination that it is likely such criminal history will continue upon release. Other factors which may be considered by the court in aggravation include whether the incarcerated parent has made an effort to communicate with the child and,

---

[2] OCGA § 15-11-2 (8) (A).
[3] OCGA § 15-11-94 (b) (4) (B) (iii), (v).

despite imprisonment, maintain a parental bond in a meaningful, supportive and parental manner.[4]

Although the aunt had obtained temporary letters of guardianship of S. R. M., "[t]hat someone else is providing good care in the absence of the parent in question does not preclude a finding of deprivation. In fact, the court may evaluate the issue of deprivation by considering the conditions in which the child[ ] would be raised if placed with the parent in question."[5] Notwithstanding the temporary guardianship, the evidence showed that, other than a single instance of holding S. R. M. while the child was asleep, the mother had made no attempt to bond with her child. She had made no attempt to contact her child's caregiver and had left the caregiver with no information for contacting her. The evidence also showed that the mother's felony convictions and imprisonment therefor had negatively affected her relationship with her child, that the mother had been repeatedly incarcerated for criminal offenses, and that the mother's criminal conduct was likely to continue. Moreover, even when the mother was not incarcerated, she made no effort to establish and maintain a parental bond with S. R. M. in any meaningful, supportive and parental manner. The evidence authorized the juvenile court's finding that S. R. M. was deprived and that the cause of the deprivation was the lack of proper parental care or control.[6]

The evidence further authorized the juvenile court's finding that the deprivation was likely to continue.[7] "Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue."[8] Here, the mother's pattern of depriving S. R. M. began at the child's birth and continued through the time of the termination hearing. Although the mother points out that she was scheduled to be released from prison within six months of the hearing, "[a]n incarcerated parent's

---

[4] *Stills v. Johnson*, 272 Ga. 645, 651 (3) (533 SE2d 695) (2000) (punctuation and footnotes omitted).

[5] *In the Interest of M. C. J.*, 242 Ga. App. 852, 855 (1) (531 SE2d 404) (2000) (citations omitted); see *In the Interest of J. L. M.*, 204 Ga. App. 46, 48 (1) (418 SE2d 415) (1992) (finding that children living with temporary guardians were deprived of proper parental control).

[6] See *In the Interest of H. M. T.*, 203 Ga. App. 247 (416 SE2d 567) (1992).

[7] See *In the Interest of D. J. F.*, 269 Ga. App. 783, 790 (2) (605 SE2d 407) (2004); *In the Interest of K. W.*, 262 Ga. App. 744, 747 (1) (c) (586 SE2d 423) (2003); *In the Interest of H. M. T.*, supra at 249; compare *In the Interest of C. C.*, 249 Ga. App. 101 (547 SE2d 738) (2001).

[8] *In the Interest of D. J. F.*, supra (citation and punctuation omitted).

claim that [release from prison] is a future possibility at which time he or she will be able to care for the child is based entirely on conjecture."[9]

Furthermore, the same evidence that authorized the juvenile court to determine that S. R. M. was deprived due to lack of proper parental control or parental inability and that such deprivation was likely to continue also supported the juvenile court's finding that such continued deprivation would likely cause serious physical, mental, emotional, or moral harm to the child and that termination of the mother's parental rights was in the child's best interest.[10] "Additionally, it is well settled that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems."[11] Here, the mother has demonstrated an unwillingness or inability to bond with and provide for her child. Since birth, S. R. M. has lived with her great aunt, who took sole responsibility for caring for the child and plans to adopt her. And the guardian ad litem opined that termination of the mother's rights was in the child's best interest.

Accordingly, the mother has failed to show merit in her contention that the evidence was insufficient to terminate her parental rights.

2. The mother contends that proceeding with the hearing in her absence violated her due process and equal protection rights.

(a) Due process requires that, prior to the termination of her parental rights, the parent receive notice and an opportunity to be heard.[12] The mother does not contest that she received proper notice, but complains that her right to be heard was compromised by the court's refusal to arrange for her transportation from a Florida prison to the hearing and its refusal to allow her to participate by telephone.

> We have repeatedly rejected this argument. We know of no constitutional entitlement mandating the [parent's] right to appear personally at the termination hearing. Nor is there any authority that [she] should be allowed to participate by telephone. Rather, [she] was invited to appear personally at the hearing, and it was due to [her] own inability to conform to the law that [she] was unable to avail [herself] of the

[9] *Stills*, supra at 651-652 (punctuation omitted).
[10] See *In the Interest of J. K.*, 278 Ga. App. 564, 566 (1) (629 SE2d 529) (2006) (recognizing that although the four factors determining parental misconduct or inability are separately listed in OCGA § 15-11-94 (b) (4) (A), "often they overlap, thus allowing evidence displaying one of the criteria to prove or at least partially prove one or more of the other criteria"); see *In the Interest of D. J. F.*, supra at 790; *In the Interest of H. M. T.*, supra at 249.
[11] *In the Interest of A. B.*, 274 Ga. App. 230, 232 (617 SE2d 189) (2005) (citation omitted).
[12] *McKinney v. Jennings*, 251 Ga. App. 18, 19 (553 SE2d 344) (2001).

opportunity to appear in person. The [juvenile] court has no obligation to make arrangements for an out-of-state prisoner to attend.[13]

As the juvenile court noted, an imprisoned out-of-state parent may present testimony to the court by affidavit or deposition.[14] Here, the mother did not avail herself of that opportunity. Because the mother had the opportunity to be heard through her counsel, who represented her at the hearing, her due process rights were not violated.[15]

(b) The mother's equal protection challenge is not properly before this court. Neither below nor on appeal did the mother identify any individual similarly situated to her, but treated differently.[16] The mother did not raise, and the juvenile court did not rule upon, any equal protection challenge.[17]

*Judgment affirmed. Smith, P. J., and Ruffin, J., concur.*

DECIDED FEBRUARY 6, 2007.

*Dorothy R. Avera*, for appellant.
*Donald C. Gibson, John P. Rivers*, for appellee.

---

[13] Id. (punctuation and footnotes omitted).

[14] Id. at 20.

[15] See id.

[16] See *Etkind v. Suarez*, 271 Ga. 352, 355 (3) (519 SE2d 210) (1999) ("The Equal Protection Clause of both the Federal and Georgia Constitutions requires that similarly situated individuals be treated in a similar manner."); *In the Interest of V. M. T.*, 243 Ga. App. 732, 735 (1) (b) (534 SE2d 452) (2000) (first step in any equal protection analysis is to determine whether the alleged constitutional violation involves similarly situated individuals).

[17] See *In the Interest of F. C.*, 248 Ga. App. 675, 680 (4) (549 SE2d 125) (2001) (equal protection challenge, which is not raised and ruled upon in the trial court, presents nothing for review in this court).