655 S.E.2d 336 (2007)
In the Interest of A.D.M. et al., children. (three cases)
Nos. A07A2341-A07A2343.
Court of Appeals of Georgia.
December 4, 2007.
David Joseph Koontz, Marietta, for Appellant (case no. A07A2341).
*337 Jamie L. Smith, David A. Canale, for Appellant (case no. A07A2342).
Roderick H. Martin, for Appellant (case no. A07A2343).
Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Senior Asst. Atty. Gen., Elizabeth M. Williamson, Asst. Atty. Gen., Shawn Clayton Bugbee, Sanders Buie Deen, for Appellee.
BLACKBURN, Presiding Judge.
Following the termination of their parental rights to A.D.M., H.L.M., T.L.M., A.L.C., A.N.C., C.P.C., Jr., and J.J.U.-R. (the "children"), L.R. (the mother of all the children), J.P.R. (the father of J.J.U.-R.), and C.C., Sr. (the father of the remaining children) each appeal the termination of their parental rights, contending that the evidence was insufficient. We have consolidated their cases for review, and we affirm in each case.

Case No. A07A2341
1. In this appeal, L.R. contends that the evidence did not support the juvenile court's termination order. We disagree.
In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated. In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.
(Footnote omitted.) In the Interest of T.L.[1] "In determining the balance of the interests of the children against parental rights, the juvenile court is vested with broad discretion which will not be controlled on appeal in the absence of manifest abuse, where the ruling is supported by clear and convincing evidence." (Punctuation omitted.) In the Interest of J.A.[2]
So viewed, the record shows that L.R., a thirty-four-year-old with a bi-polar disorder, is the mother of all seven children, six of whom were fathered by C.C. Sr., whom L.R. never married. The seventh and youngest child was fathered by J.P.R., L.R.'s husband since 2003.[3]
Georgia's Department of Human Resources, through the Fulton County Department of Family and Children Services, first intervened on behalf of five of the then-born children in 2003, alleging the children to be deprived due to L.R.'s incarceration and admission to shoplifting, obstructing a police officer, and violating her probation. The Juvenile Court of Fulton County found the children deprived and placed them into custody of Fulton County DFCS. The Fulton County DFCS's custody was extended (and newly-born C.P.C., Jr. was placed into protective custody) until December 2004. L.R. was briefly incarcerated again in 2005 and was found to lack stable housing.
Subsequently, the Cobb County DFCS filed the consolidated deprivation and termination petition at issue in this case, and took custody of the six children in September 2005 when L.R. and J.P.R. were arrested based on a robbery charge. The charge stemmed from an altercation occurring at 4:30 a.m. based on an allegation that L.R. was seeking money in exchange for performing sexual acts with the victim. L.R. pled guilty and was released from prison in January 2006; J.P.R. was not prosecuted. In September and October 2006, the juvenile court held a hearing on the consolidated petition, ultimately finding the children deprived and terminating the parental rights of L.R., C.C. Sr., and J.P.R.
We now address whether the criteria for termination were met.
The Georgia Code sets forth a two-step process to be used in termination of parental rights cases. First, the trial court determines *338 whether there is present clear and convincing evidence of parental misconduct or inability. Four factors must be present to establish parental misconduct or inability: (1) the child must be deprived; (2) the lack of proper parental care or control by the parent in question must cause the deprivation; (3) the cause of the deprivation must be likely to continue; and (4) continued deprivation must be likely to cause the child serious physical, mental, emotional, or moral harm. If the trial court finds that these four factors exist, then the court determines whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home.
(Citations and punctuation omitted.) In the Interest of R.C.M.[4] See OCGA § 15-11-94(a), (b)(4)(A)(i)-(iv).
(a) The children are deprived. Under OCGA § 15-11-2(8)(A), a child is deprived if the child is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." In determining whether the child is without proper parental care or control, the court is authorized to consider, among other things, (i) a medically verifiable deficiency of the parent's mental health of such duration or nature as to render the parent unable to adequately provide for the needs of the child; (ii) excessive use of intoxicating liquors with the effect of rendering the parent incapable of providing adequately for the child; (iii) a conviction of the parent of a felony and imprisonment therefor, which has a demonstrable negative effect on the quality of the parent-child relationship; and (iv) injury of a sibling under circumstances which constitute substantial evidence that such injury resulted from parental neglect or abuse. OCGA § 15-11-94(b)(4)(B)(i)-(iii), (vi). See In the Interest of S.R.M.[5]
Here, the record demonstrates that L.R. has been incarcerated various times throughout the children's lives, stemming from felony obstruction of an officer (2001), shoplifting (2002), probation revocation for failure to comply with probation conditions (2003), and robbery (2005). L.R.'s periodic incarceration has prevented her from obtaining stable employment and providing adequate housing, care, control or supervision of her children. During her incarceration, the children stayed with C.C., Sr. who lacked appropriate food and clothing for the children.
Further, it is undisputed that L.R. has been diagnosed with bipolar disorder, and has at least once been involuntarily committed to Grady Hospital. A neighbor testified that L.R. behaves erratically and that L.R. had broken several of the neighbor's windows. During visitation, L.R. attempted to give ten and eleven-year-old children pacifiers. Up until and during the termination hearing, L.R. demonstrated anger management issues and emotional instability. During visitation, when accompanied by C.C., Sr., DFCS reported that she and C.C., Sr. argued and yelled at each other in the presence of the children at each visit, and on one occasion L.R. and C.C., Sr. had to be escorted from the DFCS office by security. The children demonstrated fear of L.R. and C.C., Sr. during visitation. L.R. has a history of violent behavior, which led to violent exchanges between L.R. and a sibling of the children. L.R. had threatened prior DFCS caseworkers, and, during the termination hearing, she threatened witnesses, caseworkers, and deputies in the courtroom, requiring the judge to have L.R. handcuffed after several unheeded rebukes.
L.R. also admitted to a DFCS caseworker that she "has a tendency to drink too much when she's upset," and, during the termination hearing, L.R. admitted to drinking every day "maybe . . . two or three beers and . . . probably some tequila or [scotch]." In 2005, C.P.C., Jr. was admitted to the hospital after being burned during or immediately after L.R.'s night-long drinking binge.
These conditions have harmed the children as further evidenced by DFCS reporting that all of L.R.'s children have emotional and *339 behavioral problems. However, despite being informed of this during evaluations, L.R. failed to exhibit any concerns about her children or parenting abilities. Based on the evidence of L.R.'s continued psychological and emotional instability, her multiple incarcerations, her alcohol abuse, the prior injuries resulting to at least one of the children, and her apparent lack of concern for harm to her children, the evidence was sufficient to support the juvenile court's finding that the children would be deprived if returned to L.R.'s custody. See In the Interest of K.A.B.[6] (focusing in part on mother's substance abuse and mental illness).
(b) Lack of proper parental care or control by L.R. is the cause of children's status as deprived. Based on the evidence of L.R.'s psychological illness, criminal history, and continuing alcohol abuse, the juvenile court was authorized to find that L.R.'s lack of proper parental care or control is the cause of the children's status as deprived. See, e.g., In the Interest of M.S.[7] (statutory standards met based in part on failure to manage anger, control alcohol abuse, and demonstrate any insight into mental health problems).
(c) The cause of deprivation is likely to continue or not be remedied. "It is well settled that courts may consider the past conduct of a parent in determining whether the deprivation is likely to continue." In the Interest of B.R.[8] Here, DFCS's involvement with L.R. goes back to before 1996, when L.R.'s parental rights to three other children were terminated in 1996. Five of the children at issue here were adjudicated deprived in 2003 by the Juvenile Court of Fulton County, based in part on L.R.'s failure to participate in mental health treatment and comply with a reunification plan. L.R.'s anger management issues and emotional instability continued to manifest themselves throughout the course of the termination hearing, and she admitted to drinking heavily even up through the termination hearing. In light of L.R.'s long history with DFCS, her multiple incarcerations, the lack of material improvement in L.R.'s maladaptive behaviors, and her continued mental illness, the evidence authorized a finding that the cause of the deprivation was likely to continue. See In the Interest of K.N.C.[9]
(d) Continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children. Although L.R. engages in regular supervised visitation of the children, at least one child expressed a desire to remain in foster care. DFCS reported that all of the children have emotional and behavioral problems and at least one child was injured while L.R. was drinking. Accordingly, we find sufficient evidence to conclude that, should the children be returned to L.R.'s care, their continued deprivation would be likely to cause serious harm to the children. See In the Interest of D.L.T.[10] ("[t]he same evidence that the child's deprivation is likely to continue . . . may also support a finding that a child will likely suffer serious harm from that continued deprivation").
(e) Termination is in the best interests of the children.
The determination as to the children's best interests must be made considering the children's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. A juvenile court has broad discretion in determining how the interests of the children are best served. Those same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent would be in the children's best interests.
*340 (Citations, punctuation and footnotes omitted.) In the Interest of K.J.M.[11]
L.R.'s history of criminal activity, incarceration, mental illness, and alcohol abuse have resulted in emotional and in some cases physical harm to the children. At least one child has expressed a desire to stay in foster care. L.R. continued to drink heavily and demonstrate emotional instability at the time of the termination hearing, to the point of having to be handcuffed during a portion of the hearing. Further, the guardian ad litem recommended termination of L.R.'s parental rights as in the best interests of the children. Under these circumstances, there was sufficient evidence to conclude that termination was in the best interests of the children.

Case No. A07A2342
2. In the second of these consolidated appeals, C.C., Sr. appeals the termination of his parental rights to A.D.M., H.L.M., T.L.M., A.L.C., A.N.C., and C.P.C., Jr. He contends that the evidence did not support the termination order. We disagree.
(a) The children are deprived. Viewed in a light most favorable to the juvenile court's ruling, the record shows that, when not in DFCS custody, the children lived with L.R. and C.C., Sr. (who were never married) until L.R. married J.P.R. in 2003. During the time the children lived with C.C., Sr. during L.R.'s incarceration, DFCS caseworkers investigating during L.R.'s incarceration found the home to be in an unsanitary condition, the infant and toddler children were left in charge of cleaning the house, and the children were unclean. A psychologist who evaluated C.C., Sr. in 2004 reported C.C., Sr.'s inability to cope with life stresses, resulting in a pattern of unstable employment and unsuccessful relationships. C.C., Sr. demonstrated difficulty managing his anger, and during the proceedings, called a witness and left a message saying, "I'm going to tell you one time, leave my name out of your motherfing mouth. That's the only time I tell you."
In December 2005, C.C., Sr. was ordered to provide appropriate furniture, clothing, food, housing and child care for the children; however, at the time of the September 2006 termination hearing, he had demonstrated no progress toward these goals. A caseworker who was assigned to visit C.C., Sr.'s home was unable to obtain entry but reported that C.C., Sr.'s grass was several feet high. C.C., Sr. explained that his house, which he rented, had been foreclosed on and he did not want to do any further maintenance on it. Therefore, C.C., Sr. expected to move somewhere within the "52 states . . . plus [his] homeland" of St. Vincent, but had not made any further plans for housing. C.C., Sr. lacks stable employment and lives off of income from odd jobs, disability and social security payments. Although he testified to having a regular part-time job earning minimum wage as a mechanic, during earlier testimony, he could or would not state how much money he earned by working. He has made no child support payments, and during visitation C.C., Sr. often failed to show up. Finally, C.C., Sr. has been observed smoking crack cocaine, and he admitted to being "around people who use drugs."
Based on C.C., Sr.'s failure to provide stable and adequate housing, his drug use, his lack of stable employment, his ongoing difficulty with anger, his failure to pay child support, and his historical reluctance to work with DFCS, we find sufficient evidence of deprivation. See In the Interest of C.M.[12] (noting failure to comply with case plan's requirement to obtain stable housing and employment as factors in determining deprivation); In the Interest of T.B.[13] ("[a] father's failure to support his child, even in the absence of an order directing the father to pay a specific amount for the child's support, is compelling evidence that the father is not an able parent").
(b) The lack of proper parental care or control by C.C., Sr. is the cause of the children's status. As a result of C.C., Sr.'s *341 failure to maintain stable housing or employment, or adequately provide for or supervise his children, the children, should they be returned to C.C., Sr., would lack a stable home environment, would lack basic needs, and would likely be exposed to illegal drug use. Accordingly, evidence was sufficient to show that C.C., Sr.'s lack of proper parental care or control caused the children's deprived status.
(c) The cause of the deprivation is likely to continue. As noted in L.R.'s appeal, we "may consider the past conduct of a parent in determining whether the deprivation is likely to continue." In the Interest of B.R., supra, 277 Ga.App. at 836, 627 S.E.2d 879. Notably, a psychologist who interviewed C.C., Sr. specifically identified as problematic C.C., Sr.'s lack of progress in addressing his parenting failures. During supervised visitation, C.C., Sr. often did not show up, and, when he did, he spent much of the time voicing his complaints about DFCS, instead of bonding with the children. Accordingly, we find clear and convincing evidence that the cause of deprivation is likely to continue.
(d) The continued deprivation would cause serious physical, mental, emotional, or moral harm to the children. As noted in L.R.'s case, the children have emotional and behavioral problems, and have voiced a desire to stay in foster care. Accordingly, we find that, were the children to be returned to the care of C.C., Sr., continued deprivation would cause harm to the children. See In the Interest of J.K.[14] ("evidence displaying one of the [statutory] criteria [can] prove or at least partially prove one or more of the other criteria"); In the Interest of B.D.[15] (noting harm to children due to lack of stability and hope of permanent future).
(e) Termination is in the best interests of the children. As likewise noted in L.R.'s case, inasmuch as the children have manifested emotional harm, C.C., Sr. has been observed using illegal drugs and associates with other drug users, and C.C., Sr. has shown little or no improvement in providing adequate housing, securing stable employment, managing his anger, or bonding with the children during sporadic visitations, we find clear and convincing evidence that termination is in the best interests of the children.

Case No. A07A2343
3. Finally, J.P.R. appeals the termination of his parental rights with respect to his child, J.J.U.-R., contending that the evidence was not sufficient to support the termination order. We disagree.
Based on our holding in Case No. A07A2342 (L.R.'s case), the evidence sufficed to show that the standards of OCGA § 15-11-94(b)(4)(A), outlining the requirements for determining parental misconduct or inability, were met inasmuch as J.J.U.-R. was deprived by virtue of the parental misconduct and inability of L.R., J.P.R.'s wife. Such deprivation has been harmful, is likely to continue, and the evidence supports that the termination of L.R.'s parental rights is in the best interests of the child. However, J.P.R. argues that he himself is a fit father to J.J.U.-R. and that his rights should not be terminated.
We note at the outset that J.P.R.'s challenge is to the sufficiency of the evidence. Thus, our role is limited to determining
whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated. In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.

(Footnote omitted; emphasis supplied.) In the Interest of T.L., supra, 279 Ga.App. at 10, 630 S.E.2d 154. Further, a "juvenile court has broad discretion in determining how the interests of the children are best served." In the Interest of K.J.M., supra, 282 Ga.App. at 76(3), 637 S.E.2d 810.
The record shows that J.P.R. has not been a model parent, as there was evidence of his excessive drinking. Yet, in the absence of J.P.R.'s relationship with L.R., J.P.R. does exhibit more promise as a parent than his *342 wife L.R., in that he maintains steady employment, manifests a bond with his child during visitation, and does not have the same history of recurring incarceration exhibited by L.R. However, during the termination hearing, in light of L.R.'s demonstrated criminal history, mental illness, prior poor parenting, anger management issues, lack of income and employment, alcohol abuse, and the prior termination of L.R.'s parental rights to three of her children, J.P.R. was questioned regarding his judgment as to L.R.'s fitness as a parent. J.P.R. responded that he could "not see any better person than the mother of my child to take care of a child. Nobody has said that she's not capable of taking care of children, and I can see that she is capable." He expressed no intention of altering his relationship with L.R. in light of her parental unfitness, and stated that he would use L.R. as a child care provider. Therefore, as recommended by the guardian ad litem, "given the fact that [J.P.R.] is intending to stay in his relationship with [L.R.] and that . . . the evidence . . . against her . . . [favoring] termination is overwhelming . . ., termination of his rights is in order" to protect the best interests of J.J.U.-R., whose primary care giver would be L.R. See In the Interest of R.B.[16] (considering exposure to the mother's unrehabilitated drug use in father's deprivation case); In the Interest of T.J.[17] (in mother's case, considering criminal history and substance abuse of father); In the Interest of R.A.R.[18] (weighing exposure to boyfriend with extensive criminal history); In the Interest of T.B.R.[19] (court can consider exposure to spouse with history of substance abuse, unemployment, and crime). See also In the Interest of K.W.[20] (considering the guardian ad litem's recommendation as to children's best interests). Accordingly, we find the appellate evidentiary standard met and discern no abuse of the juvenile court's discretion in determining the best interests of J.J.U.-R.
Judgment affirmed in Case Nos. A07A2341 and A07A2342. Judgment affirmed in Case No. A07A2343.
RUFFIN and BERNES, JJ., concur.
BERNES, J., concurs, RUFFIN, J., concurs in judgment only.
NOTES
[1] In the Interest of T.L., 279 Ga.App. 7, 10, 630 S.E.2d 154 (2006).
[2] In the Interest of J.A., 286 Ga.App. 704, 704-705, 649 S.E.2d 882 (2007).
[3] L.R. is also the mother of three other children by her first husband (prior to her relationship with C.C., Jr.) whom she married at age sixteen after leaving home at age eleven. Her parental rights to those children were terminated after she abandoned the family.
[4] In the Interest of R.C.M., 284 Ga.App. 791, 792, 645 S.E.2d 363 (2007).
[5] In the Interest of S.R.M., 283 Ga.App. 463, 465(1), 641 S.E.2d 666 (2007).
[6] In the Interest of K.A.B., 285 Ga.App. 537, 541(1)(b), 646 S.E.2d 736 (2007).
[7] In the Interest of M.S., 279 Ga.App. 254, 262(2), 630 S.E.2d 856 (2006).
[8] In the Interest of B.R., 277 Ga.App. 833, 836, 627 S.E.2d 879 (2006).
[9] In the Interest of K.N.C., 264 Ga.App. 475, 481(4)(a), 590 S.E.2d 792 (2003).
[10] In the Interest of D.L.T., 283 Ga.App. 223, 228(2), 641 S.E.2d 236 (2007).
[11] In the Interest of K.J.M., 282 Ga.App. 72, 76-77(3), 637 S.E.2d 810 (2006).
[12] In the Interest of C.M., 282 Ga.App. 502, 505(1)(a), 639 S.E.2d 323 (2006).
[13] In the Interest of T.B., 267 Ga.App. 484, 486-487(1), 600 S.E.2d 432 (2004).
[14] In the Interest of J.K., 278 Ga.App. 564, 566(1), 629 S.E.2d 529 (2006).
[15] In the Interest of B.D., 281 Ga.App. 725, 728(1), 637 S.E.2d 123 (2006).
[16] In the Interest of R.B., 285 Ga.App. 556, 561(3), 647 S.E.2d 300 (2007).
[17] In the Interest of T.J., 281 Ga.App. 308, 313(1), 636 S.E.2d 54 (2006).
[18] In the Interest of R.A.R., 259 Ga.App. 680, 686(3), 577 S.E.2d 872 (2003).
[19] In the Interest of T.B.R., 224 Ga.App. 470, 474(1)(c), 480 S.E.2d 901 (1997).
[20] In the Interest of K.W., 283 Ga.App. 398, 402(1)(e), 641 S.E.2d 598 (2007).