630 S.E.2d 154 (2006)
279 Ga. App. 7
In the Interest of T.L., a child.
In the Interest of D.L. et al., children.
Nos. A06A0379, A06A0380.
Court of Appeals of Georgia.
April 17, 2006.
*156 McCamy, Phillips, Tuggle & Fordham, Curtis A. Kleem, Dalton, for appellant (case no. A06A0379).
Meron Dagnew, Bentley C. Adams III, for appellant (case no. A06A0380).
Thurbert Baker, Attorney General, Shalen Nelson, Senior Assistant Attorney General, Charissa Ruel, Assistant Attorney General, Bruce Kling, Dalton, for appellee.
JOHNSON, Presiding Judge.
These appeals involve an order of the juvenile court terminating the father's parental rights to T.L. and terminating the mother's parental rights to T.L., D.L., and A.T. In Case No. A06A0379, the father appeals the juvenile court's order. In Case No. A06A0380, the mother appeals the juvenile court's order. Because the cases involve essentially the same set of facts, we have consolidated them for appeal.
The evidence presented at the parental rights termination hearing revealed the following: D.L. first entered care with the Whitfield County Department of Family and Children Services (the "Department") in October 2001. At the adjudicatory hearing, the mother appeared, waived her right to counsel, and consented to an order finding D.L. to be deprived. The basis for the child's status as deprived was the mother's history of drug abuse and her lack of resources to meet the child's needs. The mother had been in outpatient treatment but continued to test positive on drug screens. She then entered inpatient treatment. A.T., then age four, was placed with the mother in the treatment facility. A.T. was removed from the mother's custody when the mother was ejected from *157 the program for noncompliance. A.T. was adjudicated deprived in December 2001, with the mother's consent.
The mother was given a case plan designed to reunite her with D.L. and A.T.[1] The mother's case plan required that she regularly visit the children, cooperate with the Department, complete a substance abuse treatment program, submit to random drug screens and have six consecutive months of clean drug screens, improve her parenting and anger management skills via programs, cooperate with psychological evaluations and any recommended treatment, and establish and maintain housing and an income sufficient to meet the family's needs. Similar subsequent case plans were submitted and approved by the court. On April 30, 2002, the juvenile court transferred physical custody of D.L. and A.T. to the mother. However, the mother subsequently tested positive for cocaine on June 20 and June 28, 2002.
The record shows that the Department obtained temporary legal custody of six-month-old T.L. on July 1, 2002 after the mother's positive drug tests. T.L. was adjudicated deprived and placed in the legal custody of the Department, with physical custody remaining with the mother. In October 2002, the juvenile court issued another order finding that D.L. and A.T. continued to be deprived, but allowing physical custody of the children to remain with the mother. The mother had completed all case plan goals for A.T. except six consecutive months of random drug screens. Return of legal custody was pending six months of clean drug screens. Additional case plans were filed and approved by the juvenile court.
The mother tested positive for cocaine in December 2002, but continued to retain physical custody of the children. New case plans were implemented, with goals similar to those in the previous case plans. In March 2003, the mother tested positive for methamphetamine, and the children were removed and placed in foster care. The juvenile court adjudicated T.L. deprived and awarded legal custody to the Department. The juvenile court also continued the Department's custody of D.L. and A.T., with the mother's consent. Two weeks after the custody extension hearing, on September 23, 2003, the mother tested positive for cocaine. Renewed case plans were filed and adopted by the court.
In late 2003, DNA testing revealed that Roger Sistrunk is T.L.'s biological father. An October 21, 2003 case review report indicated that the father called the Department to schedule an interview to get a case plan. However, the father never showed up for the appointment or called to reschedule the appointment. The Department implemented a nonreunification case plan for the father. This plan required him to maintain a stable, safe home, maintain stable employment, learn proper parenting and nurturing skills, undergo a psychological evaluation, remain drug and alcohol free, cooperate with the Department, and pay $30 per week in child support. A judicial citizen panel reviewed the case and recommended that the juvenile court terminate the father's parental rights. The father did not attend this panel meeting.
On February 16, 2004, the juvenile court held a detention hearing, during which the mother admitted that she continued to use illegal drugs. On February 20, 2004, the Department filed a deprivation petition on behalf of T.L. The juvenile court entered a March 4, 2004 order continuing the Department's custody of T.L., and renewed case plans for the mother and T.L.'s father were filed and approved. The goals remained the same as in the prior plans. The juvenile court entered a provisional order on June 3, 2004 finding T.L. to be deprived. After the father failed to appear at the final adjudicatory hearing, the court served the father by publication and entered an order finalizing the provisional deprivation order. The juvenile court provided the mother with an abbreviated case plan.
On July 14, 2004, the juvenile court transferred legal custody of the children to the mother, finding she had completed her abbreviated case plan. However, the mother tested positive for cocaine in November 2004, *158 and the children were returned to foster care. The Department filed a deprivation petition and a motion for nonreunification. The father was personally served with the petition, but did not appear at the adjudicatory hearing. During the December 2004 adjudicatory hearing, the Department announced that it intended to file for termination of parental rights due to the long history of repeated removal of the children from the mother, the mother's failure to complete goals and remain drug free, and the failure of all the fathers to complete any case plan goals. The mother consented to the consolidation of the adjudicatory/termination hearings.
The Department implemented nonreunification case plans, and a judicial citizen panel recommended termination of parental rights. On April 12, 2005, the Department filed complaints seeking termination of parental rights. Two months later, the father filed a petition to legitimate T.L. On July 28, 2005, the juvenile court held a hearing on the father's legitimation petition, the Department's deprivation petition, and the Department's termination petition. The children's guardian ad litem recommended termination of parental rights. The juvenile court entered an order denying the father's petition to legitimate T.L., finding T.L. and A.T. to be deprived, terminating the parental rights of both the mother and father, and awarding the Department permanent custody of T.L. and A.T. The mother and T.L.'s father appeal.
A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[2] If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[3]
In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated.[4] In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.[5]

Case No. A06A0379
At the termination hearing, the father testified that he had seven biological children by three different women. The Murray County Department of Family and Children Services had obtained custody of two of his children in August 1997 when the father left belt marks and bruises on one of the children while the father was intoxicated. The father's rights to those two children were terminated based on his noncompliance with reunification case plans. The father also acknowledged that the Whitfield County Department of Family and Children Services had custody of three other children. The father consented to nonreunification as to these children.
The father further testified that he had been released from jail only six days earlier, after having served a four-month sentence for violating his probation on a driving under the influence of alcohol ("DUI") charge. He admitted being incarcerated for 14 days in 2003 on a DUI conviction, pleading guilty to DUI and driving with a suspended license in January 2004, and being convicted of DUI again in March 2005. The father also admitted that he had been convicted for felony drug possession.
*159 According to the father, he had lived with his mother prior to his incarceration. He had held numerous jobs with temporary employment agencies since September 2003. He further testified that he had paid child support directly to the mother and not through the Department, but admitted he was in arrears for child support for T.L. and four other children. In fact, evidence was introduced showing that the father owed nearly $800 in child support arrears for T.L.
The father claimed to have visited T.L. daily after she was returned to her mother in July 2004. He visited the child monthly after she entered the Department's custody in November 2004. T.L.'s case manager from July 2002 testified that the Department was unaware of the father's whereabouts during the majority of the time she worked with the family. Eventually, the Department's visitation center closed the father's case because his whereabouts were unknown. The father did not request that his visits with T.L. be re-established.
The caseworker further testified that T.L. had lived with A.T. in the same foster care home since November 2004. The Department had identified a family interested in adopting both children. T.L.'s case manager since January 2005 testified that she lost all contact with the father during his incarceration. She opined that T.L. had been harmed by repeatedly entering the Department's care and cited T.L.'s bald spots, where she twists and pulls her hair when she is anxious.
1. The father contends the trial court erred in (1) finding that T.L. was deprived when the child was initially taken into custody by the Department on November 4, 2004, (2) finding that T.L. was deprived on the date of the termination hearing, and (3) terminating his parental rights without clear and convincing evidence that a lack of proper parental care or control by the father was the cause of the child's status as deprived. According to the father: "The only reason the child was taken into care was because of the one positive drug test by the mother. The evidence is silent as to any present acts or failures to act by the Appellant that led to deprivation." We find no error.
Under Georgia law, a deprived child is one who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[6] This definition focuses on the needs of the child regardless of parental fault. It is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue.[7]
Here, there is undisputed evidence that the mother continuously used a variety of illegal drugs. In determining whether a child is without proper parental care or control, the juvenile court may consider
excessive use of or history of chronic unrehabilitated abuse of intoxicating liquors or narcotic or dangerous drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child.[8]
Even though there is no evidence of how the mother's drug use adversely affected T.L., there is clear and convincing evidence that the mother abused cocaine, methamphetamine and marijuana. Viewing this evidence in the light most favorable to support the juvenile court's judgment, "it is a fair inference that use of [controlled substances] by a parent has an adverse effect on a minor child."[9] The juvenile court properly found T.L. to be deprived.
The father asserts that there was no evidence that T.L. was deprived because of his acts or omissions. However, the evidence contradicts this assertion. In cases in which the child is not in the custody of the parent who is the subject of the termination proceeding, *160 the juvenile court shall also consider whether the parent, without justifiable cause, failed significantly for a period of one year or longer prior to the filing of the termination petition to provide for the care and support of the child or to comply with a court-ordered reunification plan.[10] Here, the record establishes that the father failed to support T.L. and failed to comply with his case plan goals.[11]
Furthermore, the Georgia Code also authorizes the juvenile court to consider the following factors in deciding whether a child is deprived: physical, mental or emotional neglect of the child or evidence of past physical, mental or emotional neglect of the child or of another child by the parent.[12] In the present case, the juvenile court properly considered the father's neglect of his other children in determining that his lack of proper parental care and control caused T.L.'s deprivation.
The record also contains evidence regarding the father's neglect of T.L. The father learned that he was T.L.'s biological father in September 2003, but waited almost two years before filing a petition to legitimate the child. In addition, the Department was often unaware of the father's whereabouts, and the visitation center closed his case because of his failure to maintain contact. The father visited T.L. at most five times in the eight and one-half months preceding the termination hearing. The neglect was also demonstrated by the father's unrehabilitated alcohol abuse and criminal conduct, as demonstrated through the father's numerous DUI convictions. The Department noted that the father has never obtained any recommended substance abuse treatment. The trial court did not err in finding T.L. to be deprived and finding the father to be a cause of that deprivation.
While the juvenile court misstated the law by indicating in its order that the father's involuntary termination of his parental rights to his other children was a sufficient basis to terminate his parental rights to T.L., it is well settled that the record must affirmatively show error and harm before appellate relief is mandated.[13] Here, the juvenile court's erroneous holding was not a harmful error because the court made sufficient other findings that support its decision to terminate the father's parental rights.
2. The father contends his parental rights were terminated without clear and convincing evidence that any continued deprivation will cause or is likely to cause serious physical, mental, emotional or moral harm to T.L. While the juvenile court's order did not set forth explicit factual findings to support its conclusion that T.L. would suffer serious harm from continued deprivation, the order contained numerous facts which support that conclusion.[14] A parent's repeated failure to remain drug or alcohol free, a parent's failure to take the steps necessary to reunite with the child, and the child's need for a stable home are factors which the court should consider in finding that the child would suffer serious harm from continued deprivation.[15]
Here, the evidence shows that T.L. was only six months old when she first entered the Department's custody. The child has been removed from her mother's custody four separate times and has never lived with the father. In addition, the Department has identified a family that would like to adopt both T.L. and her half-sister, A.T. This evidence supports the juvenile court's conclusion that continued deprivation is likely to harm T.L.[16]
*161 It is well established that children need a permanent home and are likely to suffer emotional problems if they do not have a permanent home or emotional stability.[17] A caseworker's testimony about the need for permanence and injury to the child may be considered by the juvenile court.[18] Here, the caseworker testified that T.L. twists and pulls her hair when she is anxious, resulting in bald spots. The caseworker also testified about the bond formed between T.L. and A.T. while in foster care and the family who wishes to adopt both children. The juvenile court's conclusion that T.L.'s continued deprivation is likely to cause her serious harm is supported by the record.
3. The father argues that his parental rights were terminated without clear and convincing evidence that doing so would serve the child's best interest. However, the same factors showing the existence of parental misconduct or inability can support a finding that termination of parental rights would be in the child's best interest.[19] And, when considering the best interest of the child, the juvenile court may also consider the child's need for a stable and permanent home environment.[20] In light of these considerations, the record supports the juvenile court's conclusion that termination of the father's rights was in T.L.'s best interest.

Case No. A06A0380
At the termination hearing, the mother testified that she first sought treatment for alcohol abuse in 1990 and that she had an ongoing problem with drug abuse since 1993. The mother admitted using drugs after the children most recently entered the Department's custody in November 2004, but claimed she had not used drugs since January 2005. However, she noted that she was not able to provide a urine specimen on the date of the termination hearing because she had already urinated earlier that day and could not produce enough urine for a specimen. The mother confirmed that she was not attending AA or NA meetings. According to the mother, she did not pay child support because she received disability benefits as a result of learning disabilities. She had worked at a restaurant for eight months and earned $30 to $40 per week in salary and $50 to $60 per week in tips.
A psychologist who evaluated the mother on January 21, 2005 testified that she scored extremely high on the depression scale questionnaire and reported serious depression. The psychologist recommended obtaining mental health care, including medication to treat her depression, but the mother was not taking any antidepressants at the time of the hearing. The psychologist opined that the mother had a serious drug dependency. He believed she would only have a 50 percent chance of recovery if she entered a drug treatment program. Based on the results of the mother's evaluation and the evidence of her continued drug use, the psychologist recommended termination of her parental rights.
The mother's case manager testified at length about the mother's unrehabilitated substance abuse. Despite working with a drug rehabilitation expert for two years, the mother continued to test positive for cocaine, methamphetamine and marijuana. In fact, the mother tested positive for drugs on February 28, 2005, after the children had been removed from her home. In addition, she never presented any proof of attendance at AA or NA meetings since November 2004.
Regarding T.L. and A.T., the case manager testified that they had lived together in the same foster care home since November 3, 2004. While this home was not a potential adoptive placement, the Department had identified a family that was interested in adopting both children. A.T. was looking forward to having a permanent home and a new family. The children's case manager opined that T.L. had been harmed by repeatedly being removed from the mother's custody. She noted that T.L. has been pulling her hair out.
*162 4. The mother contends the evidence was insufficient to support the juvenile court's finding of deprivation. However, there is no question in this case that T.L. and A.T. are deprived. The mother failed to appeal the juvenile court's prior orders regarding deprivation, and, as such, she is now bound by the prior findings in this appeal.[21] In addition, as we stated above in Division 1, the trial court correctly found that T.L. and A.T. were deprived.
5. The mother asserts there was no clear and convincing evidence of parental misconduct or inability to support the termination of her parental rights. We disagree. OCGA § 15-11-94(b)(4)(A) mandates that the court determines parental misconduct or inability by finding that (i) the child is deprived, (ii) the lack of proper parental care or control by the parent is the cause of the child's status as deprived, (iii) such cause of deprivation is likely to continue or will not likely be remedied, and (iv) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. As stated above, T.L. and A.T. are clearly deprived and the mother's lack of proper parental care or control is the cause of the children's deprivation.
The third and fourth determinations are whether the deprivation is likely to continue and whether the children will suffer serious physical, mental, emotional, or moral harm as a result of the continued deprivation.[22] In making these determinations, the juvenile court may consider evidence of present parental misconduct or inability, as well as evidence of past misconduct. Such an inference is appropriate, since the juvenile court is not required to reunite the children with the mother in order to obtain current evidence of deprivation or neglect.[23]
Here, despite repeated removal of her children,[24] the mother did not regularly attend a treatment program or stop abusing drugs. She relapsed after attending a treatment program in November 2004 and subsequently acquiring custody of her children. She continued to use drugs throughout the time she tried to comply with her case plan goals. Even after the Department filed its petition for termination, the mother still tested positive for controlled substances. Although the mother claims she is no longer abusing drugs, the juvenile court found that her failure to obtain a court-ordered drug screen on the day of the termination hearing "speaks volumes to the court about her current use of illicit substances." It is well established that "the decision as to children's futures must be based on more than positive promises that are contrary to negative past fact."[25] A parent's conduct over the years is a better predictor of future conduct than a few months of partial stability.[26] The evidence sufficiently supported the juvenile court's determination that the children's deprivation was likely to continue because of the mother's unfitness.
The evidence presented during the termination hearing also supports the juvenile court's finding that the continued deprivation would cause serious harm to the children. The mother's repeated failure to remain drug free and failure to take the steps necessary to reunite with her children were sufficient to prove that the continued deprivation would cause the children serious harm.[27] Additionally, it is well settled that children need permanence of home and emotional stability or they are likely to suffer serious emotional *163 problems.[28] Here, the children's case manager and guardian ad litem both testified regarding the effect of anxiety on the children and the fact that the Department has identified a family wishing to adopt both children.
In light of the mother's egregious past history of drug abuse, the repeated removal of the children from her care, and her failure to comply with her case plan goals, the evidence supported the trial court's termination of the mother's parental rights.
6. The mother contends the evidence was insufficient to establish that termination of her parental rights was in the best interests of her children. We find no error. We are persuaded that the termination of the mother's parental rights is in the best interests of the children, considering the children's physical, mental, emotional and moral condition and their need for a secure and stable home.[29] "The same evidence showing parental misconduct or inability may, and here does, establish this requirement."[30] The juvenile court has broad discretion in determining how the interest of the child is best served,[31] and we find no error in the juvenile court's exercise of its discretion in this case.
Judgments affirmed.
MILLER and ELLINGTON, JJ., concur.
NOTES
[1] At the termination hearing at issue here, the mother consented to the entry of an order finding D.L. deprived and to the grant of a motion for nonreunification. Therefore, the termination of the mother's parental rights as to D.L. is not at issue in this appeal.
[2] OCGA § 15-11-94(b)(4)(A)(i)-(iv).
[3] OCGA § 15-11-94(a).
[4] In the Interest of S.L.B., 265 Ga.App. 684, 687(1), 595 S.E.2d 370 (2004).
[5] Id. at 684, 595 S.E.2d 370.
[6] OCGA § 15-11-2(8)(A).
[7] See In the Interest of J.P., 267 Ga. 492, 480 S.E.2d 8 (1997).
[8] (Citations and punctuation omitted.) In the Interest of J.L., 269 Ga.App. 226, 229(1), 603 S.E.2d 742 (2004); see also OCGA § 15-11-94(b)(4)(B)(ii).
[9] In the Interest of J.L., supra; In the Interest of S.L.B., supra at 687(1), 595 S.E.2d 370.
[10] OCGA § 15-11-94(b)(4)(C)(ii)-(iii).
[11] See In the Interest of J.J., 259 Ga.App. 159, 162, 575 S.E.2d 921 (2003).
[12] OCGA § 15-11-94(b)(4)(B)(v).
[13] See In the Interest of M.T.C., 267 Ga.App. 160, 162, 598 S.E.2d 879 (2004).
[14] See In the Interest of J.S.T.S., 273 Ga.App. 221, 226-227, 614 S.E.2d 863 (2005).
[15] In the Interest of A.B., 274 Ga.App. 230, 232, 617 S.E.2d 189 (2005); In the Interest of B.I.F., 264 Ga.App. 777, 780-781(1), 592 S.E.2d 441 (2003).
[16] See In the Interest of J.W.M., 273 Ga.App. 20, 23(1)(d), 614 S.E.2d 163 (2005).
[17] In the Interest of B.I.F., supra.
[18] Id.
[19] See Id. at 781(2), 592 S.E.2d 441.
[20] Id.
[21] In the Interest of C.R.G., 272 Ga.App. 161, 164, 611 S.E.2d 784 (2005); In the Interest of B.S., 265 Ga.App. 795, 797, 595 S.E.2d 607 (2004).
[22] OCGA § 15-11-94(b)(4)(A)(iii), (iv).
[23] In the Interest of B.S., supra at 798, 595 S.E.2d 607.
[24] T.L. was removed from the mother four times, and A.T. was removed from the mother three times.
[25] In the Interest of B.S., supra at 798, 595 S.E.2d 607.
[26] In the Interest of L.S.D., 243 Ga.App. 626, 628, 534 S.E.2d 109 (2000).
[27] In the Interest of J.S.T.S., supra at 225-226, 614 S.E.2d 863.
[28] In the Interest of A.B., supra at 232, 617 S.E.2d 189 (2005).
[29] OCGA § 15-11-94(a).
[30] (Citations and punctuation omitted.) In the Interest of A.B., supra at 233, 617 S.E.2d 189.
[31] In the Interest of M.L.P., 236 Ga.App. 504, 510(1)(d), 512 S.E.2d 652 (1999).