647 S.E.2d 360 (2007)
In the Interest of K.D., a Child.
No. A07A0099.
Court of Appeals of Georgia.
June 5, 2007.
*362 Wade N. Krueger, Vicky O. Kimbrell, Lisa J. Krisher, Phyllis J. Holmen, Atlanta, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charles R. Reddick, for appellee.
ELLINGTON, Judge.
The father of two-year-old K.D. appeals from the juvenile court's termination of his parental rights.[1] In several related enumerations of error, he complains that the trial court's findings of fact were not supported by clear and convincing evidence. We disagree and affirm the court's order.
A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. [OCGA § 15-11-94(b)(4)(A)(i)-(iv).] If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. [OCGA § 15-11-94(a).]
In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine *363 whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated. In so doing, we do not weigh the evidence or determine, the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.
(Footnotes omitted.) In the Interest of T.L., 279 Ga.App. 7, 10, 630 S.E.2d 154 (2006).
Viewed in favor of the juvenile court's ruling, the evidence shows the following facts. When K.D. was born prematurely on June 20, 2004, he weighed less than four pounds and was considered "medically fragile." At the time of K.D.'s birth, both the mother and the child's putative father, the appellant herein, were 18 years old. The parents were not married, and the appellant was not listed as the father on K.D.'s birth certificate. When K.D. was five days old, the Lowndes County Department of Family and Children Services the ("Department") obtained custody of K.D. pursuant to an emergency shelter care order, which was based upon a showing that the mother had no home or means of support and that she had already lost custody of another child due to neglect.[2] According to two Department employees, K.D.'s mother reported that K.D. had been born prematurely due to a domestic dispute between the mother and the appellant, during which the appellant pushed the mother down, causing her to go into early labor. The Department initially placed K.D. in a group home that specialized in caring for medically fragile infants, then placed him in a foster home a few months later.
On July 27, 2004, the court conducted a deprivation hearing, during which it found that neither the mother nor the appellant had a job or a stable home, the appellant was not paying child support, and the mother had already lost custody of her older child. As a result, the court found that K.D. was deprived and entered an order granting custody of K.D. to the Department. Although the appellant had not legitimated K.D., he attended the deprivation hearing. During that hearing, the court informed the appellant that he had to legitimate K.D. if he were interested in visiting with or obtaining custody of the child. According to a Department case manager, the appellant showed no interest in obtaining custody of K.D. at that point. The record shows that the appellant failed to legitimate K.D., register on the Putative Father Registry as a possible father of K.D., pay any child support, pay for the child's health care, or pay the medical expenses associated with the child's birth. A DNA test in October 2004 confirmed that the appellant was the biological father of K.D.
On January 26, 2005, the Superior Court of Lowndes County ordered the appellant to pay $179 per month in child support beginning March 1, 2005. Pursuant to the court's order, the Office of Child Support Enforcement issued an income deduction order withholding the support payment from the appellant's paychecks.[3]
On July 22, 2005, the Department filed a petition asking for a permanency hearing. During a hearing on the petition on July 19, 2005, the Department indicated that it intended to file a petition to terminate the parental rights to K.D. and put the child up for adoption. The court told the appellant that he had to legitimate K.D. within three months if he wanted to contest the petition.
In September 2005, when K.D. was 15 months old, the appellant for the first time expressed some interest in becoming involved in K.D.'s life and trying to obtain custody of the child. The appellant met with a Department case manager to discuss case plan requirements and legitimation of K.D. The case plan required the appellant to legitimate K.D.; maintain a clean and stable home; maintain employment; pay monthly child support; visit K.D. on a regular basis; obtain furniture, a car seat, and other essentials for K.D.; participate in a psychological *364 examination; obtain counseling; and complete parenting classes. The case plan also required the appellant and his fiancée, who had accompanied him to the September meeting, to undergo random drug screenings. During the meeting, the appellant's fiancée asked the case manager if marijuana would show up on the drug tests, because the appellant liked to smoke marijuana "now and then." The case manager told the appellant and his fiancée that marijuana would show up on the drug tests and reminded them that they had to remain free from any substance abuse for at least six months under the case plan.
The appellant filed a petition to legitimate K.D. on September 12, 2005, almost two months after the court told him to do so, and the legitimation order was entered on November 18, 2005. At that time, the Department arranged for the appellant to visit with K.D. for two hours every other week for supervised visitations. The Department provided transportation for the appellant and his fiancée from their home in Valdosta to Savannah, and the appellant visited with K.D. about six times between November 2005 and April 2006. According to the testimony of those who supervised the visits, K.D. would often cry uncontrollably during the visits. They described the visits as "very traumatic" to K.D. and testified that there was no bond between the appellant and K.D., who did not know the appellant was his father.
During a November 2005 unannounced home visit, a case manager found the living room of the appellant's home empty except for a television, television stand, and computer chair, and there were no furnishings for K.D. The appellant's fiancée told the manager that the rest of their furniture was being repaired; she also said that they were going to buy a bed for K.D.
On December 7, 2005, the Department filed a formal petition to terminate the parental rights to K.D. Even so, the Department continued to work with the appellant and his fiancee on the case plan and transported them to visitations with K.D.
In January 2006, the Department received a complaint of possible neglect alleging that the appellant and his fiancée had left the fiancée's ten-year-old son alone for long periods of time and that the home in which they were living was "filthy." During an unannounced home visit on January 21, 2006, a Department case manager found papers, clothing, and trash strewn throughout the home and animal feces on the floor in the child's room. Although the appellant's fiancée had told the Department that they had already purchased furniture for K.D., there was no such furniture in the home at that time. Shortly thereafter, the appellant and his fiancée moved into another home without notifying the Department or leaving a forwarding address.
The appellant's former landlord testified that the appellant rented a house from him from October 2005 until January 2006, when the landlord evicted them for failing to pay rent and causing damage to the home. The landlord testified that, when the appellant moved out, the home was in very bad condition, with animal feces on the floor and damage to the furniture and window blinds. At the time of the termination hearing, the appellant still owed the landlord $1,066 in past due rent and other costs.
Another Department case manager conducted an unannounced visit to the appellant's new home on March 13, 2006, and she found that the new home was also in disarray, with trash and clothes "everywhere," furniture that was "torn up," and no furnishings for K.D.
The evidence also showed that, at the time of the hearing, the appellant had a job but did not have a checking account or any money saved. His fiancée was unemployed. The appellant admitted that he had never paid any child support or other expenses for K.D. except what was automatically garnished from his paycheck. He also admitted that he had lived in seven different residences since K.D. was born and had been evicted from a house less than three months before the hearing. The appellant repeatedly moved without telling the Department or giving the Department his new address or phone number. At the time of the hearing, neither the appellant nor his fiancée had a car that worked, the appellant did not have any money *365 to repair his car, the fiancée's car had been repossessed for nonpayment, the fiancée's driver's license had been suspended twice and she had been arrested for driving on a suspended license, and she had no money to get her license reinstated or to pay for insurance. In addition, the evidence showed that the 20-year-old appellant had been to "boot camp" twice as a juvenile, had been kicked out of school in the ninth grade for hitting a girl in the face, had never completed high school or a GED, and had pled guilty to criminal trespass following an altercation with K.D.'s maternal grandparents. Further, the appellant admitted that he had used marijuana as recently as August 2005 and had only quit using the drug when the Department began requesting random drug screens.
Finally, a case manager testified that K.D. had never bonded with the appellant, with whom the child had had only nine brief visits in almost two years. She testified that K.D. would be harmed if he were placed in the appellant's home, because the child does not know the appellant as his father and because the appellant was not prepared for caring for the child. She also testified that K.D. had been living with his foster parents since he was an infant, so they were the only parents he has ever known and he was very bonded to them. She testified that K.D. was happy, content, and very well-adjusted in the foster home. The evidence also showed that K.D.'s half-brother, K.H., had been moved to the same foster family's home in January 2006, and the manager testified that the foster parents wanted to adopt both of the children. The manager testified that keeping siblings together was a departmental goal and that it would be harmful to K.D. and K.H. if they were separated. In addition, the case manager testified that the Department tries to achieve permanency for children who have been in foster care for 15 months, because children who remain in foster care too long tend to have difficulty bonding with people, lack a feeling of security and stability, develop behavioral problems, and suffer the stigmatization of being a foster child.
Following the hearing, the court issued a comprehensive order terminating the parental rights to K.D. Its specific findings of fact are outlined below. Based upon such factual findings, the court concluded that K.D. was deprived[4] and that such deprivation was caused, in part, by the appellant's abuse of the mother and his "abandonment" of K.D. from birth until he legitimated the child in November 2005,[5] by his failure to pay child support from June 2004 until May 2005,[6] by his unjustifiable failure to consistently visit or develop a parental bond with K.D.,[7] and by his unjustifiable failure to comply with his case plan.[8] Further, the court found that, based upon the evidence presented, K.D.'s deprivation was likely to continue if the parental rights were not terminated[9] and that K.D. would suffer serious harm as a result.[10] Consequently, the court found that termination of the appellant's parental rights was in the best interest of the child.[11]
1. On appeal, the father attacks the juvenile court's findings of fact, complaining that they were not supported by clear and convincing evidence. Specifically, he contends that the court erred in finding that (a) he did not consistently pay child support; (b) he did not regularly visit K.D. and failed to develop and maintain a parental bond with K.D.; (c) he failed to legitimate K.D. in a timely manner; (d) he committed domestic violence against the mother; and (e) he had another child born out of wedlock whom he has failed to support. As stated above, on appeal, this Court views the evidence presented in the light most favorable to the lower court's order and determines whether the court's factual findings were supported by clear and convincing evidence. In the Interest of T.L., 279 Ga.App. at 10, 630 S.E.2d 154. When *366 making this determination, we do not weigh the evidence or judge the credibility of the witnesses. Id.
(a) Child Support. The court found that the appellant admitted that he failed to provide any child support for K.D. for almost a year after the child was born. The court also found that the appellant was $591.24 in arrears in his child support obligation as of February 2006 and that the appellant involuntarily paid the balance when his income tax refund was intercepted by the government and used to meet that obligation. As shown above, these findings are supported by clear and convincing evidence.
Further, the evidence showed that the only child support the appellant has paid has been that which was garnished from his wages and, even with such arrangement, the appellant somehow fell behind in his payments. The totality of the evidence supports a finding that the appellant has not voluntarily fulfilled his support obligations to the child.
(b) Visitation and Parental Bond. The court found that the appellant visited K.D. only three times in the year and a half between the child's birth and the appellant's legitimation of the child, and only visited the child six times between the legitimation and the termination hearing. The court concluded that the appellant had abandoned any interest in K.D. from the time the child was born until the Department decided to file a termination petition and put the child up for adoption. It also found that K.D. does not know the appellant as his father, that the child usually cried uncontrollably during the visits, and that there is no parental bond between the appellant and K.D. Viewing the evidence in favor of the court's order, there was more than sufficient clear and convincing evidence to support these findings.
(c) Legitimation. The court found that the appellant "was not included in any type of case plan for reunification until January 2006 due to the father's failure to legitimate his child for more than one year and despite numerous directions by the Court and the Department to do so," and noted that the appellant did not legitimate K.D. until November 2005, when the child was almost 18 months old. The court's order also stated that the appellant had been ordered to legitimate K.D. "within three months of a hearing held in July 2005, and the father failed to complete the legitimation process until November 2005." In fact, the evidence showed that the appellant did not even attempt to legitimate K.D. until the Department put him on notice that it intended to place the child up for adoption and, even then, the appellant waited almost two months to apply for legitimation. This evidence supports the court's finding that the appellant failed to legitimate K.D. in a timely manner.
(d) Domestic Violence. The court found that K.D. "was born premature due to [the mother and the appellant] being involved in a domestic dispute" and that the appellant became violent with the mother while she was pregnant with K.D. The finding regarding the domestic dispute was based upon statements that the mother made to a protective services investigator employed by the Department. The appellant testified that he never abused the mother, and he argues on appeal that the only evidence supporting the court's findings was inadmissible hearsay.
Pretermitting whether the testimony regarding the specific domestic dispute between the mother and the appellant was inadmissible hearsay, the record contains substantial additional evidence of an extremely volatile relationship between the appellant and K.D.'s mother. The evidence showed that, during the mother's pregnancy, she and the appellant often argued bitterly during visitations with K.D.'s older half-brother, K.H. The individual who supervised the visitations testified that the appellant "would sometimes be violent [during] these visits and throwing things, throwing chairs on the visit." She testified that the appellant raised his voice and repeatedly "snatched" K.H. away from the mother. The supervisor had to repeatedly counsel the appellant to calm down and control his temper because he was scaring K.H., but he ignored her instructions. She stated that she sometimes had to physically separate the appellant and the mother when their arguments escalated. She stated that K.H. appeared to be frightened of *367 the appellant and she described the visits as "nonproductive." In addition to this evidence, another individual who supervised a visit by the mother and the appellant with K.D. and K.H. in August 2004 testified that there was "hostility" between the parents.
Given the evidence of the appellant's aggressive behavior toward the mother and his inability to control his anger around K.D. and K.H., as well as the other evidence supporting termination of the appellant's parental rights, we find that even if there was insufficient clear and convincing evidence that the appellant actually pushed the mother and caused her premature labor, it is very likely that this would not change the court's ruling on the termination petition.
(e) Failure to Support Another Illegitimate Child. During the hearing, the appellant testified that another woman was claiming that he was the father of her five-year-old son. The appellant acknowledged that the child looked like him and that he often visited the child. He admitted that he had known about the woman's claim that he was the child's father for over a year, but had failed to take a DNA test to determine the paternity of the child, legitimate the child, and pay any support for the child during that time because he did not have the $25 fee for the test and did not want to do the test "just yet." Based upon this testimony, the court concluded that the appellant's inaction toward this "other illegitimate child" was one factor that supported the termination of his parental rights to K.D. We agree. Although the appellant may not, in fact, be the child's biological father, the fact that the appellant has failed to take any steps to determine whether he is the biological father and, if so, to legitimate and support the child favors a finding that the appellant is unprepared to voluntarily assume the responsibilities of parenthood, despite his claims to the contrary. Accordingly, the appellant's argument provides no basis for reversing the court's order.
2. The father claims that there was no probative evidence to support the court's finding that K.D. had bonded with his foster parents and that they wanted to adopt him. He argues that the foster parents did not testify at the hearing, so the only evidence presented on this issue by the Department was hearsay.
As recounted above, however, the Department's case manager testified about her personal observations of the interactions between K.D. and the foster parents, and gave her opinion that there was a strong bond between them. She also testified that the foster parents had agreed to adopt K.D. and his half-brother, K.H., if the biological parents' rights were terminated. In addition to this evidence, a case manager with Lutheran Services of Georgia testified that she supervised K.D.'s care with the foster parents and observed the appellant's visitation with K.D. She testified that K.D. has a "very strong" bond with his foster parents and considers them his mother and father, calling the foster mother "mom." The Lutheran Services case manager testified that K.D. cries when he has to leave the foster mother or when he's not around her, K.D. considers the foster parents' son to be "his brother," and K.D. interacts well with everyone in the family. She also testified that the foster parents want to adopt both K.D. and K.H. and want to keep the children together. Even more compelling is the appellant's fiancee's admission that K.D. was very bonded to his foster mother. Accordingly, the appellant's argument that there is insufficient evidence to support a showing that K.D. has a strong bond with his foster parents lacks merit.
Further, pretermitting whether the foster parents were required to actually testify at the hearing in order to prove their willingness to adopt K.D., their interest in adopting K.D. was only relevant to the court's decision of whether it was in the child's best interest to terminate the appellant's parental rights.[12] It was the Department, not the foster parents, who pursued this termination action, and the foster parents' interest in adopting K.D. was contingent on the court first determining that there were sufficient grounds to terminate the parental rights to K.D. under *368 OCGA § 15-11-94(b)(4). Given the clear and convincing evidence supporting the court's conclusion that the factors outlined in OCGA § 15-11-94(b)(4) were present in this case, as discussed in Divisions 1, 3 and 4, we find that the fact the foster parents did not testify at the termination hearing presents no basis for reversing the court's order.
3. The father argues that the court erred in finding that he did not comply with his case plan. He asserts that he fulfilled the requirements of the January 2006 case plan, which he contends is the first and only case plan that applied to him.[13]
The record shows that the Department initially included the appellant in a July 2004 case plan, but removed him due to his failure to participate in any portion of the plan. From that time until September 2005, the Department did not create a case plan for the appellant because he had not legitimated K.D., nor had he even expressed an interest in obtaining custody of the child. Only after the appellant learned that the Department was going to pursue termination of his parental rights and put the toddler up for adoption did the appellant meet with the Department in September to find out what he needed to do to obtain custody. At that point, the Department specifically told the appellant about the case plan requirements. These requirements were essentially the same as those included in the January 2006 case plan.
The appellant claims that he fulfilled the requirements by maintaining a job, passing random drug tests, passing a psychological examination, and completing a parenting class. He admits that there was conflicting evidence on whether he had maintained a stable and safe home.
As an initial matter, however, we note that there was clear and convincing evidence that the appellant failed to voluntarily comply with his court-ordered child support payments and failed to develop a parental bond with K.D., both of which were requirements of the case plan, and that he failed to legitimate K.D. in a timely manner. See Division 1.
Regarding the housing requirement, the court found that the appellant failed to obtain and maintain stable, clean and safe housing, noted that the appellant repeatedly moved without notifying the Department, and found that the appellant had lived in at least seven different residences since K.D.'s birth. The court also found that the appellant had moved into his current residence in February 2006, just over two months before the termination hearing, and had failed to obtain furnishings for K.D. or make other preparations for caring for the child. Although the appellant testified that he purchased furniture for K.D. the day before the termination hearing, he failed to provide any proof of the purchase, and the court noted that the appellant had previously lied about this in the past. The evidence, as recounted above in detail, supports the court's finding that the appellant failed to maintain a clean, safe and stable home.
As for the psychological evaluation and drug testing requirements, the evidence showed that the appellant missed two appointments for a psychological evaluation in December 2005 and February 2006. Although the appellant finally completed a psychological exam in February 2006, he admitted during the termination hearing that he did not tell the psychologist about his conviction for criminal trespassing because the psychologist "didn't ask." Further, although the appellant passed random drug tests between November 2005 and the hearing, he was not tested before November and admitted that he only stopped smoking marijuana because he found out he was going to be drug tested.
We conclude that there was sufficient clear and convincing evidence to support the court's finding that the appellant had failed to fulfill the requirements of his case plan.
4. The father contends the court erred in finding that the causes of K.D.'s *369 deprivation were likely to continue. The appellant relies on evidence that, at the time of the termination hearing, he had a job, had lived in the same house for about three months, and had completed the rest of the requirements of the case plan.
As shown in Divisions 1 and 3, however, the evidence showed that the appellant had failed to voluntarily support the child, had failed to develop a bond with the child, and had failed to maintain a clean, stable and safe home. In fact, not only was he evicted from a house in January 2006, but a home visit just a month before the termination hearing revealed that his home was filthy and in disarray, with no furniture or supplies for K.D.
Moreover, with the exception of having a job and paying child support through automatic garnishments of his paychecks, none of the appellant's positive efforts toward obtaining custody of K.D. began until after the Department notified him that they were going to terminate his parental rights and put the child up for adoption. He did not stop smoking marijuana until he learned he was going to be drug tested, and he failed to get his psychological exam until shortly before the termination hearing in April 2006. And although the appellant had a few brief visits with K.D., he has never spent more than two hours at a time with the child, has never had visits to settings other than "happy-time" trips to parks, restaurants, etc., and has never had unsupervised visits with the child.
"Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue." (Citation and punctuation omitted.) In the Interest of R.N., 224 Ga.App. 202, 204(1)(c), 480 S.E.2d 243 (1997). See also In the Interest of T.B., 267 Ga.App. 484, 486(1), 600 S.E.2d 432 (2004) (accord).
Even in light of some evidence that the [appellant] had taken some steps toward reforming [his] life, such improvements are not conclusive of parental fitness in light of [his] prior history. The juvenile court was authorized to infer from the evidence of past conduct that the improvements in the [appellant's] situation were not sufficient to justify maintaining the child in foster care limbo in hopes that the [appellant] could achieve the needed parenting skills and provide an adequate home for [K.D.]. The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact.
(Citations and punctuation omitted.) In the Interest of B.J.F., 276 Ga.App. 437, 442(1)(c), 623 S.E.2d 547 (2005). Further, it is the responsibility of the juvenile court, not this Court, to judge the credibility of the appellant's good intentions toward improving his life. Id. at 441(1)(c), 623 S.E.2d 547. In so doing,
[t]he [juvenile] court was authorized to assign less weight to assertions of sudden parental fitness based on belated efforts to comply with a case plan after termination proceedings begin. While this may indicate an attempt to comply with the DFCS reunification plan, it falls very short of negating years of abandonment and harmful neglect. The [juvenile] court correctly observed that a few months of partial stability does not establish for the court that the [appellant is] capable of maintaining the progress.
(Citations and punctuation omitted.) In the Interest of J.S., 232 Ga.App. 876, 880(1), 502 S.E.2d 788 (1998).
Having reviewed the record in this case, we find that there is sufficient clear and convincing evidence to support the juvenile court's conclusion that it is likely that the causes of K.D.'s deprivation would continue if the appellant's parental rights were not terminated.
Judgment affirmed.
ANDREWS, P.J., and ADAMS, J., concur.
NOTES
[1] The court also terminated the mother's parental rights. She is not a party to this appeal. In the same order, the court terminated the parental rights to K.D.'s half-brother, K.H. Because the appellant is not the legal, biological, or putative father of K.H., that ruling is not contested in this appeal.
[2] The mother lost custody of K.D.'s half-brother, K.H., in February 2004 due to her involvement in a domestic dispute with her sister, as well as her lack of a source of income and stable housing.
[3] Even so, the appellant somehow fell behind in his child support payments, and, in February 2006, over $500 of his income tax refund was seized to satisfy his obligation.
[4] OCGA § 15-11-94(b)(4)(A)(i).
[5] OCGA § 15-11-94(b)(4)(B)(v).
[6] OCGA § 15-11-94(b)(4)(C)(ii).
[7] OCGA § 15-11-94(b)(4)(C)(i).
[8] OCGA § 15-11-94(b)(4)(C)(iii).
[9] OCGA § 15-11-94(b)(4)(A)(iii).
[10] OCGA § 15-11-94(b)(4)(A)(iv).
[11] OCGA § 15-11-94(a).
[12] The appellant did not challenge on appeal the court's conclusion that, based upon the evidence presented, termination of parental rights was in the child's best interest.
[13] Notably, the record shows that the appellant did not attend the January 2006 case plan review. He had moved without informing the Department, so the notice of the meeting was returned as "undeliverable." In fact, the only time the appellant met with the Department to discuss the case plan was in September 2005. There is no evidence that he ever contacted the Department regarding his case plan other than that one time.